[S.F. No. 24813. Dec. 31, 1985.]

BRIAN WHITE et al., Plaintiffs and Respondents, v.
WESTERN TITLE INSURANCE COMPANY, Defendant and Appellant.

872

876

**COUNSEL**

Garrison, Townsend & Orser, James L. Stoelker, D. D. Hughmanick, Daniel McLoughlin and Richard D. Carrington for Defendant and Appellant.

Stanford H. Atwood, Jr., Robert Knox, Kevin L. Anderson and Atwood, Hurst & Knox as Amici Curiae on behalf of Defendant and Appellant.

Richard J. Henderson for Plaintiffs and Respondents.

## OPINION

**BROUSSARD, J.**—Plaintiffs Brian and Helen White filed suit against defendant Western Title Insurance Company for breach of contract, negligence, and breach of implied covenants of good faith and fair dealing. A jury found for plaintiffs, awarding damages of $8,400 for breach of contract and negligence, and an additional $20,000 for breach of the covenants of good faith and fair dealing. We affirm the judgment.

In 1975, William and Virginia Longhurst owned 84 acres of land on the Russian River in Mendocino County. The land was divided into two lots, one unimproved, the other improved with a ranchhouse, a barn and adjacent buildings. It contained substantial subsurface water.

On December 29, 1975, the Longhursts executed and delivered an "Easement Deed for Waterline and Well Sites," conveying to River Estates Mutual Water Corporation an "easement for a right-of-way for the construction and maintenance of a water pipeline and for the drilling of a well or wells within a defined area and an easement to take water, up to 150 [gallons per minute], from any wells within said defined area." The deed was recorded the following day.

In 1978 plaintiffs agreed to purchase the property from the Longhursts. Plaintiffs, who were unaware of the water easement, requested preliminary title reports from defendant. Each report purported to list all easements, liens and encumbrances of record, but neither mentioned the recorded water easement.

Plaintiffs and the Longhursts opened two escrows, one for each lot. Upon close of escrow defendant issued to plaintiffs two standard CLTA title insurance policies, for which plaintiffs paid $1,467.55. Neither policy mentioned the water easement.

The title insurance policies provided: "SUBJECT TO SCHEDULE B AND THE CONDITIONS AND STIPULATIONS HEREOF, WESTERN TITLE INSURANCE COMPANY . . . insures the insured . . . against loss or damage, . . . and costs, attorneys' fees and expenses . . . incurred by said insured by reason of:

"1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

"2. Any defect in or lien or encumbrance on such title; . . ."

"SCHEDULE B" provided in part that "[t]his policy does not insure against loss or damage . . . which arise[s] by reason of the following: . . .

"3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records. . . .

"5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) *water rights, claims or title to water.*" (Italics added.)

About six months after the close of escrow, River Estates Mutual Water Corporation notified plaintiffs of its intention to enter their property to implement the easement. Plaintiffs protested, and River Estates filed an action to quiet title to the easement. Plaintiffs notified defendant, who agreed to defend the proceeding. Plaintiffs, however, declined defendant's offer, preferring representation by an attorney who was then representing them in an unrelated action. River Estates eventually decided not to enforce its easement and dismissed the suit.

Plaintiffs' appraiser estimated the loss in value of their lots resulting from the potential loss of groundwater at $62,947. Plaintiffs then made a demand on defendant for that sum. Defendant acknowledged its responsibility for loss of value due to the easement (the loss attributable to the occupation of plaintiffs' land by wells and pipes, and to the water company's right to enter the property for construction and maintenance). It maintained, however, that any loss in value attributable to loss of groundwater was excluded by the policy, and since plaintiffs' claim of loss was based entirely on diminution of groundwater, declined to pay their claim.[1]

Plaintiffs filed suit in October of 1979, alleging causes of action for breach of the insurance contract and negligence in the preparation of the prelimi-

---

[1]The parties dispute whether the letter from defendant to plaintiffs on September 13, 1981, constituted a rejection of their claim. The letter states specifically that "the availability of water on the White property is not a valid consideration in the assessment of a claim under the policies of title insurance." Then, after criticizing the appraisal for not considering other possible items of loss, it concludes, stating: "This letter should not be interpreted as a rejection of your client's claim. However, the documentation provided is not sufficient for Western to properly evaluate the claim. Western will look forward to hearing from you further in this regard." Plaintiffs understood this letter to reject any claim for loss based upon the taking of groundwater, which seems a reasonable interpretation of the letter.

nary title reports. Defendant moved for summary judgment; after briefing and argument the motion was denied. Defendant then retained an appraiser, who estimated plaintiffs' loss at $2,000. Assertedly based on this estimate, defendant in May of 1980 offered to settle the case for $3,000. Defendant did not furnish plaintiffs with a copy of the appraisal, and plaintiffs rejected the offer. In June defendant served a written offer to compromise for $5,000 pursuant to Code of Civil Procedure section 998.[2] Plaintiffs, having already incurred litigation expenses exceeding this figure, rejected the offer. Plaintiffs then obtained leave of court to amend their complaint to state a cause of action for breach of the covenant of good faith and fair dealing.

The trial court separated the issues of liability and damages. The issue of liability under the original complaint was presented to the court without a jury in January of 1981; in August of that year the court rendered an interlocutory judgment finding defendant liable for breach of contract and negligence. Defendant then furnished plaintiffs with a copy of their appraisal, and filed a new offer to compromise for $15,000. Plaintiffs rejected the offer, and the remaining issues were tried to a jury in February of 1982.

The parties first presented evidence of the loss in value to plaintiffs' property; the jury returned a special verdict fixing the loss at $100 per acre, or a total of $8,400. The court then turned to the cause of action for breach of the covenant of good faith and fair dealing. Plaintiffs indicated their intention to present evidence of defendant's conduct, including settlement offers, during the whole course of the litigation. In response to defendant's objection, the court ruled that such evidence would be admissible only as to events occurring before the interlocutory judgment of August 1981. Plaintiffs' former attorney then testified to defendant's settlement offers of $3,000 and $5,000, its failure to provide plaintiffs with a written appraisal to support those offers, and the attorney's fees paid and incurred in prosecuting the suit. The jury returned a special verdict finding defendant in breach of the covenant, awarding compensatory damages of $20,000, and denying punitive damages. Defendant appeals from the judgment.

1. LIABILITY UNDER THE TERMS OF THE INSURANCE CONTRACTS.

■ The insurance policies purport to insure a "fee" interest, free from any defect in title or any lien or encumbrance on title, subject to the exceptions listed in schedule B of the policies. ■ A fee interest includes appurtenant water rights. (See *City of San Diego* v. *Sloane* (1969) 272

---

[2]Under section 998, if a plaintiff rejects a defendant's offer and fails to obtain a more favorable judgment, he cannot recover costs, is liable for defendant's costs from the time of the offer, and in the discretion of the court liable for defendant's prior costs.

Cal.App.2d 663 [77 Cal.Rptr. 620].) ■■■ Thus the only question is whether coverage under the present case is excluded by schedule B.

Schedule B contains two parts. Part two lists specific exceptions, generally encumbrances of record discovered by the title company and therefore excluded from coverage under the policy. The easement of River Estates Mutual Water Corporation was not listed in part two. Part one describes nine kinds of title defects[3] excluded generally from coverage. The first four paragraphs describe interests which should have been, but were not, recorded; item 3, for example, excludes coverage of "[e]asements, liens, or encumbrances . . . which are not shown by the public records. . . ." The remaining five paragraphs exclude interests of a type which are ordinarily

---

[3]Schedule B, part one, reads in full as follows:

"This policy does not insure against loss or damage, nor against costs, attorneys' fees or expenses, any or all of which arise by reason of the following:

"PART ONE:

"1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

"Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

"2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

"3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

"4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

"5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water.

"6. Any right, title, interest, estate or easement in land beyond the lines of the area specifically described or referred to in Schedule C, or in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing in this paragraph shall modify or limit the extent to which the ordinary right of an abutting owner for access to a physically open street or highway is insured by this policy.

"7. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions or area of the land, or the effect of any violation of any such law, ordinance or governmental regulation.

"8. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records.

"9. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant; (b) not shown by the public records and not otherwise excluded from coverage but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy or acquired the insured mortgage and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy; or (e) resulting in loss or damage which would not have been sustained if the insured claimant had been a purchaser or encumbrancer for value without knowledge."

not recorded, including, in paragraph 5, "(a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water." Defendant relies on this last exclusion to avoid coverage in the present case.

Construction of the policy, however, is controlled by the well-established rules on interpretation of insurance agreements. ■ As described most recently in *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764]: " '[A]ny ambiguity or uncertainty in an insurance policy is to be resolved against the insurer and . . . if semantically permissible, the contract will be given such construction as will fairly achieve its object of providing indemnity for the loss to which the insurance relates.' The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy. Its effect differs, depending on whether the language to be construed is found in a clause providing coverage or in one limiting coverage. ■ 'Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured . . . exclusionary clauses are interpreted narrowly against the insurer.' " (Citations omitted.)

■ The Court of Appeal in *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 941 [122 Cal.Rptr. 470], reiterated these rules in the title insurance context: "In determining what benefits or duties an insurer owes his insured pursuant to a contract of title insurance, the court may not look to the words of the policy alone, but must also consider the reasonable expectations of the public and the insured as to the type of service which the insurance entity holds itself out as ready to offer. (*Barrera* v. *State Farm Mut. Automobile Ins. Co.*, 71 Cal.2d 659, 669 [79 Cal.Rptr. 106, 456 P.2d 764].) Stated in another fashion, the provisions of the policy, ' "*must be construed so as to give the insured the protection which he reasonably had a right to expect, . . .*" ' (Original italics.) (*Gray* v. *Zurich Insurance Co.*, 65 Cal.2d 263, 270, fn. 7 [54 Cal.Rptr. 104, 419 P.2d 168].)"

■ In the present context, these rules require coverage of water rights shown in public records within the scope of an ordinary title search. The structure of the policy itself creates the impression that coverage is provided for claims of record, while excluded for unrecorded claims. This impression is reinforced by the specific language of the policy. ■ ■ ■ ■ ■ Paragraph 3, by excluding easements, liens, and encumbrances "not shown by public records," implies inclusion of such interests when recorded.[4]

---

[4]" 'Under the familiar maxim of *expressio unius est exclusio alterius* it is well settled that,

Paragraph 5, the exclusion of water rights on which defendant relies, joins that exclusion with exclusion of unpatented mining claims and exceptions in patents or authorizing legislation—interests which would not appear in the records ordinarily searched by a title company.[5]

Coverage of claims of record also accords with the purpose of the title policies and the reasonable expectations of the insured. This standard CLTA policy is a policy based upon an inspection of records and, unlike more expensive policies, does not involve inspection of the property. The purchaser of such a policy could not reasonably expect coverage against unrecorded claims, but he could reasonably expect that the title company had competently searched the records, disclosed all interests of record it discovered and agreed to protect him against any undisclosed interests.[6] Nothing in the policy makes it clear that there may be interests of record undisclosed by the policy yet excluded from coverage.[7]

We conclude that the title insurance policies here in question, construed to carry out their purpose of protecting against undisclosed recorded interests, provide coverage for water rights which appear of record within the scope of the ordinary title search. The trial court reached the same conclusion, but by a different route. It reasoned that the water rights here at issue are inseparable from the recorded easement permitting River Estates Mutual

---

when a statute expresses certain exceptions to a general rule, other exceptions are necessarily excluded.'" (*Kiely Corp.* v. *Gibson* (1964) 231 Cal.App.2d 39, 46 [41 Cal.Rptr. 559]; *Collins* v. *City & Co. of San Francisco* (1952) 112 Cal.App.2d 719, 731 [247 P.2d 362].) This canon, based on common patterns of usage and drafting, is equally applicable to the construction of contracts.

[5] Water rights may arise by appropriation, prescription, or by virtue of ownership of riparian land. Often such rights do not appear of record, or if recorded do not clearly refer to the property whose title is under investigation, or appear in the recorded chain of title to that property. The same is true of unpatented mining claims and other interests mentioned in paragraph 5. (See 2 Miller & Starr, Current Law of Cal. Real Estate (1977 ed.) § 12.31.)

[6] Defendant argues that plaintiffs did not rely on the title policies, since they were issued only when the sale was consummated. Plaintiffs did rely on the preliminary title report. If, as defendant contends (see part 2 of this opinion) that report is an offer to insure upon the terms stated, plaintiffs' reliance on that report is equivalent to reliance upon the policies issued in conformity with the report.

[7] Defendant quotes Miller and Starr, who after noting that some water rights are duly recorded in the chain of title, state that "the exclusion in the standard coverage policy is not limited merely to *unrecorded* rights. The policy apparently also intends to exclude liability arising out of recorded water interests. Therefore, a subsequent purchaser or encumbrancer is not protected by his title policy against prior interests in water on the property, whether recorded or unrecorded." (2 Miller & Starr, Current Law of Cal. Real Estate, *supra*, § 12.31.)

It may well be that the policy was intended to exclude recorded water rights, even those in the chain of title which would be discovered during the ordinary search incident to preparation of a standard title policy. Construction of the policy, however, depends not on the intent of the drafter but on the reasonable expectations of the insured. (See *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 270-271 [54 Cal.Rptr. 104, 419 P.2d 168]; *Otter* v. *General Ins. Co.* (1973) 34 Cal.App.3d 940, 950-951 [109 Cal.Rptr. 831].)

Water Corporation to construct and maintain wells and pipelines. No provision of the policies excluded such easement, and defendant from the beginning has acknowledged liability for any loss in value attributable to the easement. The loss of water rights, the trial court concluded, is a loss attributable to the easement. We raise no objection to this line of reasoning, but prefer to rest our holding upon the broader ground that a purchaser of a title policy could reasonably expect protection against recorded water rights even if they were not connected to an easement for wells or pipes.[8]

## 2. LIABILITY FOR NEGLIGENCE.

Plaintiffs' cause of action for negligence rests on long-established principles concerning the duties of a title insurer. ■ As explained in *Jarchow* v. *Transamerica Title Ins. Co.*, *supra*, 48 Cal.App.3d 917, 938-939: "When a title insurer presents a buyer with both a preliminary title report and a policy of title insurance, two distinct responsibilities are assumed. In rendering the first service, the insurer serves as an abstractor of title—and must list *all* matters of public record regarding the subject property in its preliminary report. [Citations.] ■ The duty imposed upon an abstractor of title is a rigorous one: 'An abstractor of title is hired because of his professional skill, and when searching the public records on behalf of a client he must use the degree of care commensurate with that professional skill. . . . [T]he abstractor must report all matters which could affect his client's interests and which are readily discoverable from those public records ordinarily examined when a reasonably diligent title search is made.' [Citations.] ■ Similarly, a title insurer is liable for his negligent failure to list recorded encumbrances in preliminary title reports. [Citations.]" These principles find support in the numerous cases cited in *Jarchow*, and also in the more recent decision of *Wilkinson* v. *Rives* (1981) 116 Cal.App.3d 641, 650 [172 Cal.Rptr. 254], where the court said that "[w]hen a title insurer furnishes a preliminary title report to a prospective buyer, the insurer serves as an abstractor of title and has a duty to list all matters of public record regarding the subject property in its preliminary report."

■ It is undisputed that the preliminary title report failed to list the recorded easement of River Estates Mutual Water Corporation. The failure

---

[8]We distinguish the case of *Coleman* v. *Security Title Ins. Co.* (1963) 218 Cal.App.2d 444 [32 Cal.Rptr. 575]. In that case the title insurance policy recited that the property was in the "Beaumont Irrigation District, City of Beaumont"; in fact it was in neither the district nor the city. The court held coverage was barred by the policy's exclusion of "water rights." But as appears from the opinion, it was unnecessary to reach the question of policy exclusions. The policy protected only against defects in title, and the erroneous recital in no way impaired plaintiffs' title.

of a title company to note an encumbrance of record is prima facie negligent. Defendant has made no attempt to rebut this inference of negligence.

■ Defendant relies instead on the language of the preliminary title reports and on the enactment of Insurance Code section 12340.11. Each report states that it "is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed thereby." This statement, however, appears in the report itself, not in a contract under which defendant agreed to prepare that report. Moreover, even if we viewed the title report as a contract, the quoted provision would be ineffective to relieve defendant of liability for negligence. A title company is engaged in a business affected with the public interest and cannot, by an adhesory contract, exculpate itself from liability for negligence. (*Akin* v. *Business Title Corp.* (1968) 264 Cal.App.2d 153 [70 Cal.Rptr. 287].)

■ Insurance Code section 12340.11, effective January 1, 1982, provides: "'Preliminary report', 'commitment', or 'binder' are reports furnished in connection with an application for title insurance and are offers to issue a title policy subject to the stated exceptions set forth in the reports and such other matters as may be incorporated by reference therein. The reports are not abstracts of title, nor are any of the rights, duties or responsibilities applicable to the preparation and issuance of an abstract of title applicable to the issuance of any report. Any such report shall not be construed as, nor constitute, a representation as to the condition of title to real property, but shall constitute a statement of the terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted."

Whatever the effect of this statute upon preliminary title reports prepared after January 1, 1982, it has no effect upon the present case. ■ "'It is a general rule of construction . . . that, unless the intention to make it retrospective clearly appears from the act itself, a statute will not be construed to have that effect.'" (*Western Pioneer Ins. Co.* v. *Estate of Taira* (1982) 136 Cal.App.3d 174, 180-181 [185 Cal.Rptr. 887]; see *Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 830 [114 Cal.Rptr. 589, 523 P.2d 629]; *Battle* v. *Kessler* (1983) 149 Cal.App.3d 853, 858 [197 Cal.Rptr. 170]; *Carr* v. *State of California* (1976) 58 Cal.App.3d 139, 147 [129 Cal.Rptr. 730].) This rule is particularly applicable to a statute which diminishes or extinguishes an existing cause of action. (Cf. *Robinson* v. *Pediatrics Affiliates Medical Group, Inc.* (1979) 98 Cal.App.3d 907 [159 Cal.Rptr. 791].) ■ Nothing in the language or legislative history of section 12340.11 suggests an intention to apply that statute to a preliminary title report procured prior to its effective date.

■ Defendant finally argues that the trial court refused to permit it to introduce evidence of plaintiffs' contributory negligence. Defendant offered

only to prove that plaintiffs by diligent investigation could have discovered the water easement. Since plaintiffs had no duty to investigate, but were entitled to rely on the preliminary title report, such evidence is insufficient to show contributory negligence. (See *J. H. Trisdale Inc.* v. *Shasta etc. Title Co.* (1956) 146 Cal.App.2d 831, 839 [304 P.2d 832].) Defendant did not offer to prove that plaintiffs had actual knowledge of the easement.

3. LIABILITY FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

A covenant of good faith and fair dealing is implied in every insurance contract (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575 [108 Cal.Rptr. 480, 510 P.2d 1032]), including title insurance contracts (*Jarchow* v. *Transamerica Title Ins. Co., supra,* 48 Cal.App.3d 917, 940; see *Kapelus* v. *United Title Guaranty Co.* (1971) 15 Cal.App.3d 648, 653 [93 Cal.Rptr. 278]). The jury found defendant breached the covenant, and awarded compensatory damages of $20,000. Defendant argues on appeal that the court erred in admitting, as evidence of breach, settlement offers and other matters occurring after commencement of litigation. It also asserts that no substantial evidence supports the jury's verdict.

Defendant first contends that all evidence relating to events after plaintiffs filed suit should have been excluded on the ground that, once suit has been filed, the insurer stands in an adversary position to the insured and no longer owes a duty of good faith and fair dealing. The issue is one of first impression. The parties review the numerous cases which discuss first-party good faith litigation: plaintiffs point out that none of the cases suggest that the insurer's duty of good faith terminates when suit is filed; defendant points out that all involve acts which in fact occurred before litigation commenced. But neither can point to any case which has considered the issue raised here, and we have discovered none.

We believe, however, that the issue can be resolved as a matter of principle. It is clear that the contractual relationship between insurer and the insured does not terminate with commencement of litigation. In an automobile liability policy, for example, even if the insurer and insured were engaged in litigation concerning coverage of one accident, if the insured were involved in another accident within the policy terms and coverage he would certainly be protected. In the present setting, if some third party today were to assert title to plaintiff's land—or if River Estates Mutual Water Corporation were to reassert its right to a pipeline easement—there is no doubt that defendant would be obliged to provide a defense and possible indemnity. And it is not unusual for an insurance company to provide policy benefits, such as the defense of litigation, while itself instituting suit

to determine whether and to what extent it must provide those benefits. It could not reasonably be argued under such circumstances either that the insurer no longer owes any contractual duties to the insured, or that it need not perform those duties fairly and in good faith.

Defendant's argument is less unreasonable in a case in which the insured filed suit (obviously the insurer could not be permitted to terminate its own obligations by initiating litigation), and the issue is limited to the insurer's duty of good faith and fair dealing in regard to the specific subject matter of the suit. But even here a sharp distinction between conduct before and after suit was filed would be undesirable. Defendant's proposed rule would encourage insurers to induce the early filing of suits, and to delay serious investigation and negotiation until after suit was filed when its conduct would be unencumbered by any duty to deal fairly and in good faith. Defendant responds that such delay would itself be a breach of the implied covenant, but the incentive would remain, especially since the insured would find it difficult to prove the prelitigation conduct unreasonable if it could not present evidence of the postlitigation conduct by way of contrast. The policy of encouraging prompt investigation and payment of insurance claims would be undermined by defendant's proposed rule.

Defendant argues that imposing a duty of good faith after litigation has begun will make it difficult for the insurer to defend the suit. It claims that investigation of the factual circumstances would be hampered by an obligation to reveal to the insured any material facts it discovers favorable to his claim, and that the attorney who prepares the case for trial could not conduct the trial because he would be a critical witness to the insurer's good faith during the pretrial period. Neither of these concerns, however, justify a distinction between the period before suit is filed and the period after it is filed. Certainly the insurer should have investigated the factual basis of the claim before suit is filed, and may well have utilized counsel to evaluate that claim. The issue of contractual liability can be tried separately, and prior to the trial on the good faith claim, as was done in the present case. In any event, what constitutes good faith and fair dealing depends on the circumstances of each case, including the stage of the proceedings and the posture of the parties. We trust that the jurors will be aware that parties to a lawsuit are adversaries, and will evaluate the insurer's conduct in relation to that setting.[9]

---

[9]Defendant fears that juries will misunderstand the function of various litigation tactics, and in particular that they might mistakenly view a settlement offer as an admission of liability. The trial court, however, would retain the authority to exclude evidence of settlement offers or other conduct of the insurer if it concluded that in the case before it the prejudicial effect of such evidence would outweigh its probative value. (Evid. Code, § 352.)

 Defendant next contends that the admission of the two settlement offers violated Evidence Code section 1152. That section states that "[e]vidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money . . . to another who has sustained . . . loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it." The Law Revision Commission comment to this section states that "[t]he rule excluding offers is based on the public policy in favor of the settlement of disputes without litigation."

The language of this section does not preclude the introduction of settlement negotiations if offered not to prove liability for the original loss but to prove failure to process the claim fairly and in good faith. This distinction is the basis of the Court of Appeal decision in *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]. In that case, the insurer sent two letters to its insured falsely accusing him of concealing a congenital back defect: the second letter also offered to compromise his claim under a disability policy by permitting him to retain the payments already received. Plaintiff refused the offer, and at trial introduced both letters into evidence. The Court of Appeal commented: "[Defendants' suggestion] that their letters were improperly admitted into evidence is not meritorious. . . . [T]he applicable code provision (Evid. Code, § 1152) prohibits the introduction into evidence of an offer to compromise a claim *for the purpose of proving liability for that claim.* If the letter of October 4, 1966, were considered an offer to compromise, it would be an offer to compromise the claim of liability under the policy. Plaintiff, however, did not offer the letter to prove liability under the policy but, rather, as a part of his proof of the instrumentality of the tort. Section 1152, therefore, did not preclude its admission." (10 Cal.App.3d at p. 396.) Defendant argues that both letters at issue in *Fletcher* were sent before suit was filed, but under our conclusion that the duty of good faith and fair dealing does not disappear with the filing of suit, that distinction is immaterial.

*Fletcher* also rejected the argument that the insurer's privilege to assert its legal interests would protect communications and settlement offers which were not in good faith. Defendant revives this argument with a twist; it argues that its offers, because made after commencement of litigation, are absolutely privileged under Civil Code section 47, subdivision 2.[10] No cases apply that privilege in the present context, but defendant relies generally on

---

[10]Civil Code section 47 provides in relevant part: "A privileged publication or broadcast is one made—

" . . . . . . . . . . . . . . . . . . . . .

"2. In any (1) legislative or (2) judicial proceeding. . . ." There is a specific exemption for allegations concerning third parties in a divorce proceeding.

decisions which have extended the absolute privilege beyond defamation to bar actions for intentional infliction of emotional distress or intentional interference with economic advantage (see *Herzog* v. *"A" Company, Inc.* (1982) 138 Cal.App.3d 656, 660 [188 Cal.Rptr. 155] and cases there cited), and argues that liability cannot be based upon a communication in a judicial proceeding.

It is obvious, however, that even if liability cannot be founded upon a judicial communication, it can be proved by such a communication—otherwise Evidence Code section 1152 would be unnecessary, and much of modern discovery valueless. Defendant's argument, consequently, forces us to draw a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication. In the present case plaintiffs do not assert that defendant's communications were defamatory, or done with the intent of causing emotional distress, but instead that they show that defendant was not evaluating and seeking to resolve their claim fairly and in good faith. In our opinion, section 47, subdivision 2, does not bar admission of the offers for that purpose.

■■■■■ Finally, defendant points out that its second offer—the offer of June 1980, to settle the claim for $5,000—was filed as an offer to compromise under Code of Civil Procedure section 998. Section 998, subdivision (b) states that if such an offer "is not accepted prior to trial or within 30 days after it is made, whichever occurs first, it shall be deemed withdrawn, and cannot be given in evidence upon the trial." Defendant argues that the reasoning of *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376—that Evidence Code section 1152 does not bar introduction of a settlement offer as an instrumentality of the tort—is inapplicable to section 998.[11]

We believe, however, that despite their difference in wording sections 1152 and 998 should receive a parallel construction. Section 1152 states that offers are inadmissible to prove "liability for the loss or damage," which we have construed to refer to liability for that loss or damage to be compromised by the offer. Section 998, subdivision (b), states that an offer cannot be "given in evidence upon the trial." We think that language refers

---

[11]If the May offer to settle for $3,000 were admissible, the admission into evidence of the June 1980 offer could not be reversible error. If plaintiffs had not been able to present evidence of any of the postlitigation negotiations, including the May 1980 offer, their proof of defendant's breach might have been hampered. But the fact that defendants in June of 1980 made a second offer, $2,000 higher than the first offer, did not add substantially to the case. We believe it unlikely that the exclusion of that second offer would have led to a result more favorable to defendant. (See Cal. Const., art. VI, § 13.)

to the trial upon the liability which the offer proposed to compromise. Thus both sections would serve the same purpose; to bar the introduction into evidence of an offer to compromise a claim for the purpose of proving liability for that claim, but to permit its introduction to prove some other matter at issue.

Both defendants' offers of compromise were submitted before plaintiffs had filed a claim for damages for breach of the covenant of good faith and fair dealing. Both sought only to compromise plaintiffs' original contractual and negligence claims. Under our construction of the statutes, those offers were inadmissible to prove liability on plaintiffs' original causes of action, but were admissible to prove liability for breach of the covenant. That is exactly how matters proceeded: the trial court bifurcated the trial, and admitted the offers into evidence only on the issue of liability for breach of the covenant.[12]

█ Finally, defendant contends that no substantial evidence supports the verdict finding a breach of the covenant of good faith and fair dealing. However, reading the record most favorably to the judgment below, it reveals that although defendant failed to disclose an easement of record on its preliminary title reports and its title insurance policies, it denied any liability for loss of value in water rights attributable to the easement. When plaintiffs filed suit, defendant responded with a motion for summary judgment. After losing that motion, defendant was faced with both a ruling of the trial court rejecting its narrow reading of the policy and a unanimous body of case law establishing liability for negligence. Defendant nevertheless offered only nuisance-value settlements, and made no attempt to appraise plaintiffs' loss until the issue of liability had been tried and decided in plaintiffs' favor.

The entire pattern of conduct shows a clear attempt by defendant to avoid responsibility for its obvious failure to discover and report the recorded easement of River Estates Mutual Water Corporation. We conclude that the evidence is sufficient to permit the jury to find a breach of the covenant of good faith and fair dealing.

4. DAMAGES FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

█ We agree with the Court of Appeal that there is no "merit in the . . . argument that damages for emotional distress were not permitted be-

---

[12]We find no error in the trial court's exclusion of a $15,000 settlement offer made after the interlocutory judgment of liability in August of 1981. Once the court had determined liability, defendant's willingness to make a reasonable settlement offer has little tendency to prove that defendant has been acting fairly and in good faith toward its insured.

cause that issue was unraised by the pleadings. Such an issue is reasonably, perhaps necessarily, raised by the pleaded issue of an insurer's bad faith in rejecting settlement of a meritorious claim. And here we observe that the issue of damages for emotional distress was fully and fairly tried and presented for adjudication, in the superior court."

■ The remaining question concerns recovery of attorney fees and other litigation expense as an element of damage. The Court of Appeal held that attorney fees were recoverable under the terms of the title insurance policies, which insure against "costs, attorney's fees and expenses sustained or incurred by said insured by reason of . . . any lien or encumbrance on . . . title." Defendant contends that this provision covers only actions against third parties in defense of title, and does not apply to suits against the title insurer itself. (See *Jesko* v. *American-First Title and Trust Co.* (10th Cir. 1979) 603 F.2d 815, 819.)

The trial court, however, did not award attorney fees as a separate item of damage under the quoted policy provision, but as an element of the damages for breach of the covenant of good faith and fair dealing. A subsequent decision by this court, *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796], supports the trial court's position. We there stated that " 'when the insurer's conduct is unreasonable, a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which detriment . . . includes those attorney's fees that were incurred to obtain the policy benefits and that would not have been incurred but for the insurer's tortious conduct.' " (37 Cal.3d 813, 819.) The same reasoning supports inclusion of witness fees and other litigation expenses as an element of damage.

The judgment is affirmed.

Bird, C. J., Mosk, J., and Reynoso, J., concurred.

**GRODIN, J.**—I agree with the majority that an insurer's duty to deal with its insured fairly, and not to withhold payment of claims unreasonably and in bad faith, does not evaporate with the onset of litigation. While breach of the duty gives rise to an action in tort against the insurer, the duty itself is rooted in the covenant of good faith and fair dealing, which is implied in all contracts, and which imposes upon each contracting party to refrain from doing anything which will injure the right of the other to receive the benefits of the agreement. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940 [132 Cal.Rptr. 424, 553 P.2d 584]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573-574 [108 Cal.Rptr. 480, 510

P.2d 1032].) There is no reason why this implied covenant should cease to be operative simply because litigation has begun. This is not to say—and I do not understand the majority to be saying—that all of an insurer's litigation tactics will be subject to scrutiny by a jury on the basis of a bad faith claim. An insurer must have the right to defend itself in court against claims it believes to be without merit, and the normal rules of litigation should be adequate to protect against abuse. But where an insurer has unreasonably and in bad faith withheld payment of benefits due under a policy prior to litigation, and then continues this bad faith conduct after a complaint is filed, there seems to be no compelling reason why the right to recover for that continuing wrong should terminate either because the insurer decides to file a preemptive action for declaratory relief or because the insured, under the compulsion of the insurer's recalcitrance, decides to file suit himself.[1] Once it is accepted that the insured's covenant of good faith and fair dealing does not perish with the onset of litigation, I see no reason—nor do I find any reason suggested in either of the dissenting opinions—why evidence of settlement offers should not be admissible, as relevant, in the same manner as they are admissible *prior* to litigation, apparently with legislative approval[2] to prove the elements of the tort. (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

What bothers me in this case—and, I take it, our dissenting colleagues as well—is that the two settlement offers which *were* admitted in evidence support plaintiff's theory of bad faith only weakly, and a third settlement offer, which might have been helpful to the jury's evaluation despite its somewhat disparate context, was excluded. Once the trial court decided to admit the first two offers, I believe (unlike the majority) that it should have allowed the defendant to complete the picture. However, in light of the relatively modest verdict I do not believe there has been such a miscarriage of justice as to require reversal and a new trial.

Subject to these reservations, I concur.

**LUCAS, J.,** Concurring and Dissenting.—I respectfully dissent from the affirmance of the judgment as to plaintiff insured's good faith cause of ac-

---

[1]There is no reason here to address, and I reserve judgment on, the situation where an insurer acts in good faith prior to litigation but engages in bad faith conduct following the onset of litigation.

[2]Insurance Code section 790.03, subdivision (h)(5) establishes as an unfair act an insurer's knowledge of "Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." The statute apparently contemplates that evidence of settlement offers will come in as part of the means of proving a violation of the statutory duty imposed. Although the Legislature has not explicitly addressed the common law tort of breach of the implied duty of good faith and fair dealing, from a policy standpoint there appears to be no difference between the common law duty and the statutory duty imposed by Insurance Code section 790.03, subdivision (h) as regards admissibility of settlement offers.

tion. Scylla and Charybdis had nothing on my colleagues for making life difficult—if not impossible. An insurer who refuses to pay its insured on a disputed claim is now not only at risk that its refusal will subject it to damages for breach of the covenant of good faith and fair dealing, but must also be conscious that any aspect of its conduct during litigation of the original claim of coverage may be used as significant evidence in an ensuing breach of good faith action. An insurer's unsuccessful attempts to settle during the course of the initial litigation may now be presented to a second jury, along with all other aspects of its defense. Confronted with such evidence and unfamiliar with the vagaries of litigation the jury will, I submit, in all likelihood regard any settlement attempts as prejudgment admissions of liability, and standard defense tactics as indications of a lack of good faith.[1]

The majority resolves the issue of the admissibility of the settlement information as a "matter of principle" by in part placing "trust" in the perspicacity of jurors who "will be aware that parties to a lawsuit are adversaries, and will evaluate the insurer's conduct in relation to that setting." (*Ante,* p. 887.) No guidelines are enunciated for the jury to follow in performing this balancing act. No recognition is given to the fact that "good faith" may significantly differ before and after the filing of a complaint. Moreover, when one considers that in this context "[t]he terms 'good faith' and 'bad faith' . . . are not meant to connote the absence or presence of positive misconduct of a malicious or immoral nature . . ." (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980]), the probability that jurors will place heavy reliance on settlement offers as evidence that the insurer did not have the requisite "good faith" in this context is particularly problematic and prejudicial.

When an insurer refuses to settle after a claim has been filed, an insured may seek relief by filing an action alleging a breach of contract or negligence, as was done here. As the majority asserts, the insurer and insured continue to have a contractual relationship despite the filing of such action as long as the period of coverage lasts. My colleagues' reliance here on this "continuing" duty to act in good faith as to any future aspects of the contractual relationship, is, however, misplaced. The better analysis is one which focuses on the nature of the relationship between the parties *as to the particular claim at issue.* One who it is asserted has negligently injured another continues thereafter to have a duty to refrain from inflicting new

---

[1]This possibility is exacerbated by the majority's holding that only the settlements offered here before liability was determined could be introduced. As I will discuss, the illogic of the majority's approach is well demonstrated by its refusal to find as error the exclusion of defendant's $15,000 offer made in the six months between interlocutory judgment of liability and the jury's award of only $8,400 in damages.

harm upon the victim. Nonetheless, he is still subject to suit *and* entitled to defend himself on the issue of whether the completed transaction involved negligence on his part.

The effect of a filing of an action for professional malpractice also sheds light on this question. An attorney owes a fiduciary duty to his clients. If a client sues for malpractice, the attorney is not required to handle his defense of the action as though the attorney-client relationship still existed. He is not burdened with a "continuing duty of good faith" which cramps the exercise of his defense to the malpractice claim. Nor does the filing of a suit for malpractice necessarily abrogate any duties the attorney may have regarding his handling of any other matter for the client. That there is a fundamental shift in the nature of the attorney-client relationship when a malpractice suit is filed is further demonstrated by the nullification of the attorney-client privilege which is deemed not to exist "as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship." (Evid. Code, § 958; compare, § 954 [explaining how the privilege normally applies].)

While the general good faith obligation may remain intact for the term of the insurance contract, of necessity the parties' duties and relationship alter when a given claim is made by the insured, disputed by the insurer, and suit thereon is commenced. I wonder whether the majority, to be consistent, now intends to impose on others in special relationships, such as attorneys or trustees, the same duty during litigation regarding the performance of their services.

The majority contends that a distinction drawn between pre- and postinitiation of litigation[2] settlement offers "would encourage insurers to induce the early filing of suits, and to delay serious investigation and negotiation until after suit was filed when its conduct would be unencumbered by any duty to deal fairly and in good faith." (*Ante,* p. 886.) I strongly question whether any insurer not acting in good faith will ever be interested in encouraging early action by plaintiffs.[3] Actions asserting a breach of the duty of good faith are generally based on a claim that the insurer has wrongfully delayed or denied payment. Anything that encourages early suits and early resolution of the question of coverage would, I contend, have a *beneficial* effect on the very policies that the majority purports to promote. Moreover, if it were indeed the intent of insurers "to delay serious investigation until after suit was filed," then it seems to me that promotion of early filing of

---

[2]I speak here of actions initiated by the insured. Declaratory relief actions brought by the insurer may give rise to different considerations.

[3]Of course, "inducing" litigation, early or late, is not a problem where the insurer has already paid up without dispute.

suits is definitely to be preferred. Earlier filing will force earlier serious investigation and may therefore lead to earlier payment of benefits to the insured. Of course, any failure reasonably to investigate or attempt to settle *before* suit is filed will still subject the insurer to potential liability for breach of the covenant of good faith.

The majority also, while finding Evidence Code section 1152 does not apply to bar introduction of evidence of settlement offers made in the course of the first action, gives no real consideration to the policies underlying that section. The motivation behind the prohibition is encouragement of settlement. The Law Revision Commission comment to the enactment of section 1152 expressly states "[t]he rule excluding offers is based upon the public policy in favor of settlement of disputes without litigation. The same public policy requires that admissions made during settlement negotiations also be excluded." The language of the section is sweeping as well: "(a) Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it."

In *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], upon which the majority relies, the offers of settlement which the court found admissible were made *prior* to the filing of an action against the insurer and were found relevant as part of the plaintiff's "proof of the instrumentality of the tort" alleged, namely intentional infliction of emotional distress. The *Fletcher* court had no occasion to consider whether the making of settlement offers or other conduct following commencement of trial should be admitted despite section 1152's bar.

My colleagues' wholesale acceptance, adoption and extension of the *Fletcher* approach is undertaken with only an empty nod at the policy behind section 1152. If offers of settlement, even offers made pursuant to Code of Civil Procedure section 998, are admissible in later actions, settlement negotiations will become dangerous engagements. An unaccepted offer of settlement is likely to serve as powerful evidence for plaintiffs to argue that the insurer knew its liability but failed to act accordingly. Free-wheeling settlement negotiations and exploratory offers will, I suspect, become things of the past as insurers balance present and future liabilities and interests. The effect may well redound to the disadvantage of plaintiffs who will find it harder to negotiate with constrained insurers.

Another more fundamental problem with the majority's approach is its complete failure meaningfully to consider or accord any weight to the right of a defendant to defend itself. Nothing in the majority opinion limits introduction of evidence regarding tactics during the earlier trial to attempts to settle. *Any* aspect of the defendant's "conduct" during the first trial will now be fair game. A plaintiff may argue that an answer filed by a defendant, or a defendant's motion for extension of time, or request for interrogatories, or any other action taken by a defendant in the course of defending the original litigation involving coverage is relevant to the issue of the defendant's good faith.[4] Thus anything the insurer does to defend in a coverage action in which it is ultimately unsuccessful, no matter how pro forma a part of the litigation process, may arguably under this approach be considered conduct in violation of the insurer's duty "to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. . . ." (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].)

These litigation strategies and tactics will be offered up to juries who, with the benefit of hindsight, and without the benefit of extensive exposure to litigation practices and techniques, will second guess the defendant's rationales for taking a particular course. Moreover, they may be introduced without a showing of bad intent or malice on the insurer's part or of unusual tactics or delay. In so permitting wholesale introduction of such evidence, the majority reaches a result not only inconsistent with the right to defend, but also arguably unnecessary because the trial court itself will be able during the initial action to assure that defendants do not act improperly.[5]

---

[4]The jury in the good faith portion of the action here heard evidence regarding *not only* the settlement offers per se, but also regarding the negotiations and conduct of the parties' attorneys in regard to the offers. In closing argument, the insured's counsel told the jury "The other aspect of this case is that you have a situation where they have delayed the case, you've seen the files that we've been dragging around . . . . [O]nce a suit is filed then every movement from one side produces an equal and opposite movement in the other direction, and you end up with these numerous briefs. Briefs on that, briefs on this, research depositions, there were eight or nine depositions taken in this case. Most of which were unnecessary but once somebody takes some information you've got to do the same thing to prepare for trial." There was no argument that the particular tactics used were in and of themselves improper; rather the implicit claim was that the normal delays of litigation themselves amounted to evidence of a lack of good faith.

[5]Justice Grodin's concurrence further illustrates the difficulty of extending the duty of good faith following commencement of litigation. He speaks of finding no basis for concluding evidence of settlement offers should not be admitted as relevant evidence regarding the insurer's asserted bad faith following the commencement of litigation. He then observes that the evidence regarding the defendant's settlement offers here were only "weakly" supportive of plaintiff's good faith claim. Nowhere does he explain how the offers made here and the other actions relied on by plaintiff's counsel (see, *ante,* fn. 4) were anything other than part and parcel of the insurer's "right to defend itself in court against claims it believe[d] to be without merit" (*ante,* p. 891), nor how or by whom a distinction is to be

Recently, in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637 [183 Cal.Rptr. 508, 646 P.2d 179], we had occasion to consider guidelines for determining whether an appeal is frivolous and warrants imposition of sanctions. We observed that a balance must be struck between avoiding improper conduct and assuring that attorneys are free actively to assert their clients' interests. To this end we reiterated the principle that " 'Free access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a colorable claim must be allowed to assert it without fear of suffering a penalty more severe than that typically imposed on defeated parties.' (*Young* v. *Redman* (1976) 55 Cal.App.3d 827, 838 [128 Cal.Rptr. 86].)" (31 Cal.3d at p. 648.) The majority's holding in this case imposes just such a restraint upon an insurer's right to present a defense.

Similarly, in *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878], we stressed the importance of the right to assert a defense. We held in *Bertero* that a claim asserted in a cross-pleading could give rise to an action for malicious prosecution and rejected the argument that the cross-pleading had been only defensive. In so concluding, however, we observed that courts in a line of cases starting with *Eastin* v. *Bank of Stockton* (1884) 66 Cal. 123 [4 P. 1106], had "refused to recognize a tort of malicious defense" and announced that "[w]e do not propose to establish such a tort by our holding here." (13 Cal.3d at p. 52.) *Eastin* and its progeny serve to "protect the right of a defendant, involuntarily haled into court, to conduct a vigorous defense." (*Ibid.*)

The majority here does not give any reasoned consideration to this fundamental and recognized right to defend. Nonetheless, its opinion effectively establishes potential tort liability based on a failure to "defend in good faith." Such liability extends far beyond that which could be based on even the thus far disallowed tort of "malicious defense."[6] As we have often

---

drawn between normal litigation tactics and actual conduct involving "bad faith." While utilizing the point that litigation is commenced as the cutoff may not be an ideal rule and may in a few instances result in wrongful conduct by the insurer which will not be reachable and curable by the court before which the litigation is proceeding, I nonetheless believe that such a rule is necessary in order not to chill the insurer's fundamental right to defend itself.

[6]Even those who argue that a tort of "malicious defense" should be allowed do not go so far as the majority here in loosely permitting liability to be premised on the mere defense of an action filed against one. (See Van Patten & Willard, *The Limits of Advocacy: A Proposal for the Tort of Malicious Defense in Civil Litigation* (1984) 35 Hastings L.J. 891.) They at least require an adapted version of the requirements for asserting "malicious prosecution," including "Assertion of a defense, which the defendant knows or should know is without credible basis, for the purpose of delay . . ." (*id.* at p. 936) and the fundamental requirement of malice (*id.* at p. 931). Since the elements of a cause of action for a breach of the duty of good faith and fair dealing do *not* echo those required by an action alleging

reiterated, a breach of the covenant of good faith and fair dealing requires no showing of malice or immoral intent on the part of the insurer. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at pp. 921-933, fn. 5.) The prospect of defendants automatically being sued for malicious defense or subject to an easy standard for determining if an appeal is frivolous has previously raised substantial concerns about the potential chilling effect on the right of a defendant to present its case. As a result, courts have exercised extreme caution in these areas. (Cf. *In re Marriage of Flaherty, supra,* 31 Cal.3d at p. 650 ["Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal [or at trial]. An appeal [or defense] that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals"].) Unfortunately, the majority ignores this traditional approach without a second glance.

The initiation of litigation places the parties in an entirely new arena. Whereas before filing of a suit, an insurer may feel freer to act with impunity in improperly pressuring insureds or delaying proceedings, once an action is brought in court, the plaintiff may appeal to the trial judge for relief from improper conduct on the defendant's part. If the insurer's defense is totally meritless, a motion for summary judgment can speed things along. If the insurer improperly drags its feet in preparing for trial, the trial judge has a range of options extending from imposition of monetary sanctions to striking the answer and entering judgment for the plaintiff. On the one side is the importance of affording defendants an opportunity to defend (especially where there is not even a preliminary showing of any malicious intent on the defendant's part) and the potential for prejudice to them if their trial "conduct" may be second-guessed in a subsequent action. On the other is the necessity to admit the information here at issue into evidence. I conclude that without more showing the former interests must prevail.[7]

---

malicious prosecution (or defense), it is clear that the majority has taken a giant leap forward beyond that contemplated even by those advocating recognition of a general new tort based on improper defensive conduct.

[7]Without explanation, the majority vaguely suggests that the trial court's authority to exclude evidence as more prejudicial than probative pursuant to Evidence Code section 352 will prevent juries from "misunderstand[ing] the function of various litigation tactics." (*Ante,* p. 886, fn. 9.) My colleagues offer no guidelines for that determination. Moreover, in view of their approval of the trial court's exclusion of the $15,000 settlement offer (see *ante,* p. 889, fn. 12 and *post* at p. 898), it appears that this approach may in fact work to the further detriment of insurers.

In any event, the majority fails to explain how permitting a trial court to exercise discretion cures the fundamental problems. Insurers are still left uncertain as to whether any action they take with regard to litigation on an underlying breach of contract claim may be used against them. There is no lessening of the basic constraints on a defendant's right to defend by virtue of a rule which says the trial court has discretion to decide what may be introduced.

The tunnel vision exhibited by the majority here is further emphasized by its differing treatment of the various settlement offers which were in fact made during this litigation. To review briefly, the complaint filed in October 1979 alleged a breach of the insurance contract and negligence in the preparation of the preliminary title reports. In May 1980, seven months later, the insurer offered to settle for $3,000 based on an appraisal it had ordered. That offer was rejected. The next month, the insurer served a written offer to compromise in the sum of $5,000 pursuant to the terms of Code of Civil Procedure section 998. This offer was also rejected by the insured who then successfully amended the complaint to include a cause of action for breach of the covenant of good faith and fair dealing.

The parties stipulated to bifurcating the action in order to avoid increased litigation costs should the court find no liability under the original causes of action. In August 1981, the court rendered an interlocutory judgment following a nonjury trial which had been held in January of the same year. It found that the insurer was liable for breach of contract and negligence. The insurer then filed a new Code of Civil Procedure section 998 offer to compromise for $15,000. Following rejection of this offer, the parties went to trial before a jury in February 1982.

This proceeding was also divided. In the first portion, the jury was asked to determine what damages to the value of their property the insured had suffered by virtue of the insurer's negligence and breach of the insurance contract. The jury awarded *$8,400.* That sum was (1) approximately $54,000 *less* than the insureds had been demanding, and (2) only $3,400 *more* than the June 1980 offer to compromise.

After the jury had awarded those damages, it was asked to decide whether the insurer had violated its duty of good faith and fair dealing. The court allowed the insured to offer evidence of the settlement offers and surrounding negotiations for the first two offers made in 1980 but refused to allow introduction of the offer to compromise for $15,000 made after liability had been determined. Thus, as far as the jury knew in February 1982, the insurer had last offered to settle 20 months before and had made no further offers even after liability had been determined.

The $15,000 payment was intended to settle claims arising out of both the initial breach of contract cause of action as well as the claim relating to

---

Moreover, in this case no flagrant misconduct was alleged and plaintiff's argument regarding defendant's litigation conduct can be characterized as asserting only that litigation generally caused delay. The majority nevertheless approves the trial court's admission of the $3,000 and $5,000 offers without even an attempt to apply section 352. As a result, it is difficult to see when a trial court will ever exclude such evidence following this decision.

the insurer's asserted breach of the duty of good faith and fair dealing. At the time it was made, damages had not been fixed on the former claim and the latter claim was certainly a debatable one. Moreover, the $15,000 offer was made before plaintiff incurred additional attorney fees and other costs of litigation for prosecution of the damages claim on the first cause of action as well as in pursuit of the entire claim regarding good faith. The eventual total damages award was $28,400. Since, as I will argue, the jurors might well have considered the apparent failure of the insurer to make additional settlement offers a material factor once they had learned of the earlier lower offers, it is difficult to assess how the settlement offer truly related to the damages awarded. Nonetheless, even taking into account the fact that the partial information presented to the jury might well have inflated the damages awarded for breach of good faith, the offer was well within the realm of reasonable, good faith offers when measured against the final total award and in the context of the time at which it was made.

The majority disposes of the insurer's claim of error on this point by announcing that "Once the court had determined liability, defendant's willingness to make a reasonable settlement offer has little tendency to prove that defendant has been acting fairly and in good faith toward its insured." (*Ante,* p. 889, fn. 12.) The opposite is true: The apparent continued unwillingness to make a reasonable settlement offer during this period may well have influenced the jury in its determination that the insurer was not acting in good faith. The jury found only unreasonableness, and not malice or bad intent, as indicated by its refusal to award punitive damages. If such evidence is generally to be admitted, I would argue that the exclusion of this information regarding settlement negotiations in the six months between the determination of liability and the award of damages was at least as relevant as the settlement offers which the majority allows.

I have grave doubts overall whether a sufficient showing was made of a breach of the covenant of the duty of good faith and fair dealing. I have no doubts, however, that prejudicial and improper information was offered and argued to the jury in the form of evidence relating to matters occurring during the original litigation in this action. When insurance companies abuse the rights of their insured and breach their contracts and obligations thereunder, they should be subject to the full scope of appropriate punishments under law. In the rush to punish, however, the majority has lost sight of fundamental principles of due process and fairness. The right to defend is basic to our system. Without any real showing of a need to do so, my colleagues have cavalierly hobbled that right for a class of defendants. I cannot join them in this unwarranted and unfair exercise.

I would reverse the good faith judgment and remand for further proceedings in which evidence of the insurer's conduct during litigation could not be introduced.

**KAUS, J.,** * Concurring and Dissenting.—I concur generally in Justice Lucas' concurring and dissenting opinion. In most cases, once the insured has started to litigate, the evidence of bad faith which a stingy offer may permit is submerged by the strategic and tactical maneuvers—the gamesmanship—generated by the suit. This seems particularly true in this case, where the inference would be weak even if no action had been started: the company had a plausible policy defense to an aspect of the claim with respect to which the insured's estimate of the damage was outrageously high. Even if liability on the policy had been conceded, the offers were within hailing distance of the damages which, at the time of the evidentiary ruling, the jury had already fixed at $8,400.[1] Finally I can see no rational basis for excluding the insurer's final offer of $15,000. Surely the inference as to the insurer's intent which emanates from a reasonable offer is not nullified by the fact that liability has been adjudged. Under plaintiffs' ground rules, whether the $15,000 offer was reasonable, although the consideration included dismissal of the bad faith claim, was a question of fact for the jury.

The only reason why I cannot get very excited about the result of this litigation, is that this particular jury showed unusual restraint for a type of case in which multi-million dollar awards for punitive damages appear to be almost routine. It is perhaps fortunate that so far most of the defendants in these bad faith cases have been insurance companies which can spread the cost of their mishandling of claims with relative ease. We know, however, that there is tremendous pressure on the courts, particularly this court, to extend bad faith liability to other contractual relationships. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 767-770 [206 Cal.Rptr. 354, 686 P.2d 1158].) So far we have not succumbed, although a satisfactory rationale for continued resistance is hard to come by. We have learned how to spell "banana" but not how to stop. Nevertheless, in my view it would be disastrous if every contract were to be subjected to the same set of rules which we have applied in the context of the insurer-insured relationship.[2] Without wishing to strike a blow for bad

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]On the majority's reasoning, defendant would have been better off if it had made no offer at all. Discouraging "ballpark" offers by permitting them to be used as evidence of bad faith seems very poor policy.

[2]The problem is not so much the theory of the bad faith cases, as its application. It seems to me that attorneys who handle policy claims against insurance companies are no longer interested in collecting on those claims, but spend their wits and energies trying to maneuver the insurers into committing acts which the insureds can later trot out as evidence of bad faith.

faith or unfair dealing, I just cannot see every person who wilfully breaks a contract subjected to almost unlimited liability for punitive damages.

At the same time it must be recognized that in many cases confining a successful plaintiff in a contract case to traditional damages, which do not even include attorneys' fees, is to guarantee that he will not be made whole. This seems unconscionable where the defaulting defendant has acted in bad faith. Unfortunately our desire to prevent this kind of injustice has caused us to go overboard in the other direction and paint ourselves into a corner from which we can only escape by taking back much of what we have said in the insurance cases or applying the rule of those cases to all other contracts.

While I believe that in the long run the courts can develop an equitable solution, the issue appears to be one of some urgency and no quick answers should be expected from the judiciary. On the one hand too much established law—some of it statutory—would have to be overturned or "reinterpreted" if we were to refashion contract remedies so that contract claimants against insurance companies are made truly "whole." On the other, our experience in *Seaman's* surely tells us that there are real problems in applying the substitute remedy of a tort recovery—with or without punitive damages—outside the insurance area. In other words, I believe that under all the circumstances, the problem is one for the Legislature—a suggestion which should not come as too much of a shock to devotees of separation of powers.[3]

If any legislator should feel moved to draft a bill, he could do worse than to study an excellent article by Michael Traynor which, written in the wake of *Seaman's,* reviews the need for more liberal compensatory damage awards in contract, explains why the bad faith/punitive damage solution is unsatisfactory and suggests specific remedies. (Traynor, *Bad Faith Breach of a Commercial Contract: A Comment on the Seaman's Case* (Cal. State Bar, Fall 1984) 8 Bus. L. News 1.) I copy some of the latter below.[4] To

---

[3]I emphasize that I am merely thinking about policy, not constitutionality. Certain constitutional aspects of bad faith claims against insurers are now pending in the United States Supreme Court in *Aetna Life Ins. Co.* v. *Lavoie* (Ala. 1984) 470 So.2d 1060, consideration of jurisdiction postponed to hearing on merits (1985) — U.S. — [86 L.Ed.2d 691, 105 S.Ct. 2672].

[4]"There are several ways in which damages for bad faith breach of contract could be amplified to yield an adequate compensatory award without radically altering the existing framework of contract law:

"*First,* the *Hadley v. Baxendale* [(1854) 156 Eng. Rep. 145] rule that consequential damages are limited to those in contemplation of the parties when the contract was made could be relaxed in accordance with the current trend; both the applicable statutory language and existing case law support compensatory damages that go beyond that limit and that approach

quote Mr. Traynor, the solution for the victims of breaches of contract should not be "a hit or miss game of punitive damages." (*Id.*, at p. 12.) "If," however, "judges, legislators and lawyers focus on the adequacy of compensation for breach of contract, they will be focusing on the central problem." (*Ibid.*)

Appellant's petition for a rehearing was denied February 14, 1986. Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.

---

or are comparable to compensatory damages in tort cases.

"*Second,* contractual limitations on the amount of damages or on the availability of consequential damages could be denied enforcement or circumscribed; doing so would provide a second look, at the damages phase, at clauses whose mere existence might not cause the bargain to be unconscionable but whose enforcement in a bad faith case could produce an unconscionable result.

"*Third,* the present discretion of courts to award prejudgment interest when the amount of the liability is not certain could be exercised more broadly to ameliorate the loss of opportunity and delay that results from the breach.

"*Fourth,* by legal rule and jury instruction, trial courts and juries could be encouraged as well as guided in bad faith cases to award a higher rather than a lower compensatory award within the leeways and the range of uncertainty that presently exist in the law of contract damages; such a development would recognize what now occurs frequently, although ad hoc, in practice.

"*Fifth,* in appropriate cases, a court could consider invoking principles of restitution and unjust enrichment to take away the profits resulting from a bad faith breach and award them to the party whose expectations were destroyed.

"The foregoing suggestions are by no means exhaustive; there may be additional opportunities for rationally developing the resources of contract law to improve compensatory damages when a contract is broken in bad faith." (Fns. omitted.) (Traynor, *supra,* 8 Bus. L. News at pp. 12-13.)