UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————

No. 94-2565
(CA-92-2708)

—————————

Loyd Tony Roberts,

Plaintiff - Appellee,

versus

American General Property Ins. Co.,

Defendant - Appellant.

—————————

O R D E R

—————————

The Court amends its opinion filed April 5, 1996, as follows:

On the cover sheet, section 6 -- the status line is corrected to read "Affirmed by unpublished per curiam opinion.  Judge Niemeyer wrote a dissenting opinion."

For the Court - By Direction

/s/ Bert M. Montague
—————————————————
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LOYD TONY ROBERTS,
Plaintiff-Appellee,

v.

No. 94-2565

AMERICAN GENERAL PROPERTY
INSURANCE COMPANY,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Cameron M. Currie, District Judge.
(CA-92-2708)

Argued: December 4, 1995

Decided: April 5, 1996

Before HALL and NIEMEYER, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion. Judge Niemeyer
wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Stephen Peterson Groves, Sr., YOUNG, CLEMENT,
RIVERS & TISDALE, L.L.P., Charleston, South Carolina, for Appel-
lant. V.M. Manning Smith, James Hoogenson Moss, MOSS &
KUHN, P.A., Beaufort, South Carolina, for Appellee. **ON BRIEF:**
Bradish J. Waring, YOUNG, CLEMENT, RIVERS & TISDALE,
L.L.P., Charleston, South Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

American General Property Insurance Company appeals a judgment entered on a jury verdict against it and in favor of its insured, awarding $20,000 under a fire insurance policy, $10,000 for bad faith denial of the claim, and $20,000 in punitive damages. Finding no error, we affirm.

I.

On March 11, 1992, plaintiff Loyd Tony Roberts purchased a personal property fire insurance policy from American General. The policy covered the contents of Roberts' home in Ridgeland, South Carolina. The policy limit was $20,000.

On May 27 of that same year, Roberts and his family were in Charleston, South Carolina, where Roberts was receiving therapy for a back injury. Meanwhile, their home was destroyed by fire.

The agent who wrote the policy, Barry Turpin, visited the scene the next morning and took photographs. Turpin had no authority to adjust the claim. American General's district manager, Danny McKenzie, sent the claim to the company's home office, where it was forwarded in turn to Lloyd Whipple, a regional senior property claims adjuster. Though this process took most of the first week following the fire, neither McKenzie nor Whipple had sufficient authority to adjust a claim for the full policy amount.[1]

On June 3, 1992, Duane Lewis, an "origin and cause" investigator, visited the scene at Whipple's request. A week later, he reported that he could not determine the cause of the fire; however, he did not find

_____

[1] McKenzie's authority was $5,000, and Whipple's $10,000.

any accelerants. He did report that the local fire chief had received anonymous phone calls from two persons who stated that they had seen Roberts remove furniture from the house before the fire.

On June 9, Whipple met with and questioned Roberts. He recorded the unsworn interview, which ran to ten pages when transcribed. Roberts also signed a "Non-Waiver Agreement," which provided that American General's investigative actions would not waive its rights under the policy, and a written consent to American General's entry on the insured premises to conduct its investigation. Whipple gave Roberts formal sworn proof of loss forms. Roberts promptly returned the forms on June 11, showing the value of the lost contents as $66,937. Whipple just as promptly returned them to Roberts, because they were incomplete.[2]

On June 8, Roberts obtained a specimen policy for his lawyer to review, and on June 12, the lawyer called Whipple demanding to know why the claim had not been paid. On June 16, the lawyer wrote directly to American General's home office, and enclosed amended proof of loss forms, showing a loss of $27,317 and requesting the policy limit. Whipple later testified that the lawyer's involvement impaired his ability to investigate the claim, though he conceded that the amended forms, which he received on June 19, were in satisfactory shape.[3]

According to Roberts, Turpin was more blunt. He told Roberts that the claim would have been paid if he had not retained a lawyer. In any event, because Roberts was represented, the claim was referred to Theron Guthrie, American General's in-house counsel, at its home office.

There the claim seems to have languished for a month. In mid- to late July, Guthrie referred the case to outside counsel for the purpose

_____

[2] Roberts had not listed the person or entity from which he had purchased most of the items.

[3] Whipple did complain of the lack of supporting documentation such as receipts. Roberts explained that everything he owned -- receipts included -- was lost in the fire.

3

of taking an examination of Roberts under oath. Nearly two months had now passed since the fire.

On July 29, Roberts' lawyer wrote to American General, demanding payment within ten days, else suit would be filed.**4** Even this ultimatum was slow to stir American General to action. Four more weeks passed, during which Roberts and his family were spending the summer living in a shed behind his parents' house.

On August 27, American General's outside counsel finally responded. Rather than admit or deny coverage, counsel made a written demand that Roberts submit to an examination under oath, as required by the policy. Believing that American General could and should have requested the examination under oath weeks or months earlier,**5** Roberts went ahead with his suit.

The suit was filed in state court on September 3, 1992. Roberts' primary claims were breach of contract and bad faith refusal to pay insurance benefits. American General removed the case to district court based on diversity of citizenship. It then moved to dismiss, based on Roberts' failure to submit to an examination under oath before filing suit. Roberts responded that American General had waived its right to conduct the examination by inaction. The motion was denied. A subsequent motion to require Roberts to submit to examination under oath was also denied, after Roberts and his wife gave formal depositions under Fed. R. Civ. P. 30.

A three-day trial was held in July 1994. The jury returned a verdict of $20,000 (the policy limit) for breach of contract, and $30,000 ($10,000 compensatory, $20,000 punitive) for bad faith. American

───────────────────────────────────────────

**4** By this time, the insurer of the building had completed its investigation and paid the claim. There was no coverage for contents of Roberts' home under the building policy, however, and the holder of a mortgage on Roberts' real estate received all of the cash proceeds.

**5** Roberts' counsel had support for this position in the text of the policy. Condition 4(d), under the heading "Your Duties After Loss," requires the insured to "submit to examination under oath as often as we may reasonably require[.]" "Reasonably" -- the classic weasel word of legal writing -- makes the clause much less rigid than it would otherwise be.

4

General moved for judgment notwithstanding the verdict or a new trial; Roberts moved for attorneys' fees and costs under S.C. Code § 38-59-40. The district court denied American General's motions, and awarded Roberts $17,399.73 in fees and costs.

American General appeals.

II.

On appeal, American General does not contend that Roberts committed arson. It does not contend that the contents of his house were worth less than the policy limit. Indeed, it did not seriously contest these issues at trial. Rather, it argued and persists in arguing that Roberts' filing of this suit in the face of its belated demand for an examination under oath ought to bar all recovery. A properly instructed jury found otherwise, and we must affirm its verdict if, viewing the evidence in the light most favorable to Roberts, we conclude that any reasonable jury could have so found. Duke v. Uniroyal, Inc., 928 F.2d 1413, 1417 (4th Cir.), cert. denied, 502 U.S. 963 (1991).

In its brief, American General spares no pain in extolling the utility of the examination under oath as a device to ferret out fraud by insureds against insurers. We need no convincing. Sworn testimony is a fundamental part of our system of law precisely because of the truth-revealing powers of oath and examination. Our respect for this device, however, does not translate into victory for American General.

On April 8, 1993, American General took the plaintiff's deposition. No defense to his claim was discovered. A deposition is, of course, an examination under oath. Nonetheless, American General proceeded to trial fifteen months later, pinning its hopes on a general policy provision that made the filing of a lawsuit contingent upon the insured's first having complied with all policy provisions, including submission to an examination under oath. Because forfeitures of insurance policies are disfavored in South Carolina, such a clause may not be construed as a strict condition precedent to suit. Puckett v. State Farm General Insurance Co., ___ S.C. ___, 444 S.E.2d 523 (1994). Instead, an insured's failure to cooperate bars recovery only where the insurer is prejudiced by it. Id. at 524. In light of its ability

5

to take Roberts' deposition, and its exercise of that ability, American General has not shown any prejudice here.**6**

III.

The remaining two issues go only to the $10,000 compensatory and $20,000 punitive damages awarded on the bad faith claim. In South Carolina,

> if an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action. Actual damages are not limited by the contract. Further, if he can demonstrate the insurer's actions were willful or in reckless disregard of the insured's rights, he can recover punitive damages.

Nichols v. State Farm Mutual Automobile Insurance Co., 276 S.C. 336, 306 S.E.2d 616, 619 (1983).

In its brief, American General cites a number of circumstances that supposedly justified its refusal to pay, or at least its initial delay. Other than the insured's exaggeration of the value of his personal property (which was itself largely irrelevant because the $20,000 pol-

_____

**6** In a footnote in its brief, American General asserts that Judge Currie erred in instructing the jury that Judge Shedd had denied American General's motion to dismiss and Magistrate Judge McCrorey had denied its motion to compel Roberts to submit to the examination under oath. This instruction was required to prevent American General's defense from misleading the jury. By relying on the "lack" of an examination under oath as a defense at trial, American General opened the door to Roberts' explanation, i.e., he had given a deposition, and neither Judge Shedd nor Magistrate McCrorey had required more. In light of this evidence, the charge then actually worked to American General's advantage, because the jury was told that the judges' rulings did "not take away from you the question of the examination under oath." In other words, the charge permitted the jury to find a material breach of the policy by Roberts, notwithstanding that these prior rulings implied no such breach. These instructions were unusual, to be sure, but then so were the posture of the case and American General's theory of it. We see no prejudicial error.

6

icy limit was clearly met),**7** the cited circumstances do not amount to much. American General's suspicions were aroused by such things as Roberts' receipt of worker's compensation at the time of the fire (though on a valid claim) and his occasionally late mortgage payments. Perhaps the most telling item on American General's list of horribles is this one: "Roberts obtained a specimen copy of the Policy for his <u>attorney</u> on June 8, 1992." (emphasis in original). Apparently, American General expected the jury to be offended that Roberts would have sought the help of an attorney nearly two weeks after his home was destroyed. At trial, Roberts testified that Turpin admitted to him that "if I hadn't went around and got a lawyer they would have paid it." Turpin later took the stand, but was not asked whether he had made this statement. A jury could therefore have credited Roberts' testimony on this point, and could also have concluded that aversion to dealing with the insured's attorney is not a good faith reason to deny an insurance claim.

Moreover, American General never comes to grips with its failure to admit coverage once it became clear -- at the latest, upon Roberts' deposition -- that it had no defense to the claim. Ordinarily, an insurer's good or bad faith is measured as of the time it denies the plaintiff's claim, and its conduct in resulting litigation is irrelevant. <u>See</u> B. R. Ostrager and T. R. Newman, <u>Handbook on Insurance Coverage Disputes</u>, § 12.14 (5th ed. 1992). Here, though, American General put itself in the peculiar, and at times confused, posture of neither admitting nor denying coverage, even at trial.**8**  At the charge conference,

_____

**7** Had the policy covered realty rather than personalty, the exaggeration of value would have been totally irrelevant, because an insurer is bound by statute to pay the policy limit upon a total loss by fire. S.C. Code Ann. § 38-75-20 (1989 & Supp. 1995); <u>Tedder v. Hartford Fire Insurance Co.</u>, 246 S.C. 163, 143 S.E.2d 122 (1965).

**8** In arguing its motion for directed verdict at the close of the plaintiff's case, Mr. Mozingo, American General's counsel, admitted coverage, though in an undetermined amount. The next day, Theron Guthrie, American General's in-house counsel, testified that the company still neither accepted nor denied the claim. This contradiction led Mr. Mozingo to explain, at the charge conference, that the company would have covered the loss in some amount <u>if</u> Roberts had taken an examination under oath before filing suit.

the district court pointedly inquired whether American General had any authority for the proposition that an insurance company that does not contest coverage can refuse to pay because of the pendency of a lawsuit. American General knew of no such authority, and it has cited none on appeal.**9**

In addition, the marked similarity of Puckett to this case counsels affirmance of the judgment on the bad faith claim. In Puckett, as here, the insured had given an unsworn statement in which he denied involvement in a fire that had destroyed his home. After the insured obtained the assistance of counsel, the insurer demanded an examination under oath. The insured's counsel, believing the request to be untimely and waived by the insurer's decision to take the earlier unsworn statement, filed suit, alleging breach of contract and bad faith refusal to pay. 444 S.E.2d at 523. The plaintiff's deposition was taken; he again denied committing arson. Construing the examination under oath requirement as a strict condition precedent to suit, the state trial court dismissed the action. Id. at 524. The South Carolina Supreme Court reversed, holding, as we noted above, that the insured's lack of cooperation bars recovery only upon a showing a prejudice. Id. By reversing, the Court necessarily held that the facts alleged by Puckett stated a claim of bad faith. It follows, then, that

_____

**9** When the plaintiff's bad faith claim is based on delay rather than denial, logic supports holding the insurer to a continuing duty of good faith during the litigation, at least until the insurer forthrightly denies the claim.

> [W]here an insurer has unreasonably and in bad faith withheld payment of benefits due under a policy prior to litigation, and then continues this bad faith conduct after a complaint is filed, there seems to be no compelling reason why the right to recover for that continuing wrong should terminate either because the insurer decides to file a preemptive action for declaratory relief or because the insured, under the compulsion of the insurer's recalcitrance, decides to file suit himself.

White v. Western Title Insurance Co., 40 Cal.3d 870, 710 P.2d 309, 320-321 (1985) (Grodin, J., concurring).

a jury could, upon receiving competent proof of those same facts, render a verdict for the plaintiff on that claim.**10**

IV.

One thing on American General's list of suspicious circumstances was not in evidence -- the district court forbade American General from introducing the testimony of the Ridgeland Fire Chief that he received two anonymous telephone calls just after the fire, and that the anonymous callers said that they had seen Roberts moving furniture out of his house and into his mother's shed two days before the fire. Likewise, the court excluded the testimony of the "origin and cause" investigator that the fire chief had told him about the calls. American General asserts that the exclusion of this evidence was error. Our review is for abuse of discretion. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1357 (4th Cir. 1995).

American General asserts that these extrajudicial statements were not offered as proof of the matter asserted, but rather to establish that it had a good faith reason to undertake a careful and time-consuming investigation, and, especially, to demand the examination under oath.

First of all, the investigator's testimony is clearly inadmissible, because it does rely on the truth of the matter asserted by the fire chief, i.e., that the chief received the phone calls. Hearsay within hearsay is admissible only "if each part of the combined statements conforms with an exception." Fed. R. Evid. 805.

The fire chief's own testimony clears this hurdle, but the district court felt that it foundered on Fed. R. Evid. 403-- relevant evidence may be excluded where its probative value is outweighed by its prejudicial effect. American General has no proof of arson, and does not contend that there was arson, so the prejudicial seed this testimony could have planted in the jury outweighed any value the evidence could have had in showing that, at one time, American General might have had reason to delay decision on the claim. Again, American

_____

**10** Likewise, the verdict was not clearly against the weight of the evidence, so the district court properly denied a new trial.

General failed to admit or deny coverage, even long after its suspicions were dispelled. There was no abuse of discretion here.

The judgment of the district court is affirmed.

AFFIRMED

NIEMEYER, Circuit Judge, dissenting:

The fire-loss claim submitted to American General in this case was surrounded by suspicion, both as to the cause of the fire and the amount of the loss. Moreover, the claim included items not covered by American General's policy. I believe that, before American General was required to accept or reject the claim, it was entitled to have the benefit of a full investigation. Because the insured denied it the benefit of a full investigation, American General cannot be found to have acted in bad faith for continuing its investigation before making a decision.

In March 1992, Loyd Roberts purchased a $20,000 insurance policy from American General to cover the contents of his home. In May, a little over two months later, Roberts made a claim under the policy for water damage. Because the policy did not cover that risk, however, American General denied the claim. Four days later, Roberts' house burned down. He made a claim for the policy limits for loss of the contents of his home. During this entire period, Roberts was out of work and was a month delinquent in his mortgage payments.

In the personal property inventory form that Roberts submitted to American General on June 11, 1992, as part of his claim, Roberts listed items that required additional explanation or investigation. He claimed, for example, $1,800 for sterling silver pots and pans used for cooking; $1,500 for a four-year old, 25-inch television set; $6,250 for 125 VCR tapes; and $6,000 for 1,800 trophies. In respect to his claim for loss of a movie camera, he gave as a source a store that did not sell movie cameras.

Whether these facts, and others, justified denial of coverage was an open question that American General had not answered. Appropri-

10

ately, I believe, American General sought to investigate the claims through its own personnel and attorneys, and, once its attorneys gathered enough information, through an examination of Roberts under oath, a mechanism authorized by the terms of the policy. Roberts, however, refused that examination and, instead, halted American General's investigation by suing it for bad faith in delaying payment of his claim.

Roberts' overly aggressive efforts to be paid were revealed from the beginning. Only one day after Roberts submitted the personal property inventory form to American General, he had retained an attorney who called American General, demanding to know why Roberts' claim had not yet been paid. And two and one-half months later, when no decision had yet been made under the policy because Roberts had not yet provided an examination under oath, Roberts sued the insurance company for breach of contract and bad faith, demanding $1.5 million in damages.

Not only was American General denied the opportunity to adjust the claim in the manner specified by the policy, it was also compelled to defend itself before a jury on a claim of bad faith because it insisted on contractual rights before making its decision on the claim.

While I believe the evidence at trial supports the jury's verdict in awarding Roberts the $20,000 policy limits for property lost in the fire, I can find no evidence that American General acted in bad faith. It merely demanded an investigation which the circumstances compelled and which neither Roberts nor his attorney allowed to occur.

Accordingly, I would reverse the award of $10,000 on the bad faith claim and $20,000 for punitive damages, and to that extent I respectfully dissent.

11