The BANK OF CALIFORNIA,
N.A., Appellant,

v.

FIRST AMERICAN TITLE INSURANCE
COMPANY, a California corporation,
and Security Title & Trust Agent of
Alaska, Inc., an Alaskan corporation,
Appellees.

No. S–4106.

Supreme Court of Alaska.

March 6, 1992.

Heidi A. Irvin, Bogle & Gates, Seattle,
Jan Samuel Ostrovsky, S. Jay Seymour,
Bogle & Gates, Anchorage, for appellant.

James M. Gorski, Paul S. Wilcox,
Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellees.

Before RABINOWITZ, C.J., and
BURKE, MATTHEWS, COMPTON and
MOORE, JJ.

OPINION

MATTHEWS, Justice.

I.

Appellant, the Bank of California, sued appellees, Security Title and Trust Agency of Alaska (Security Title) and First American Title Insurance Company (First American), for misrepresentation and breach of contract. The superior court granted appellees' summary judgment motion. The Bank appeals. We affirm in part and reverse in part.

In June of 1984, Peter Zamarello owned a piece of real estate in Anchorage on Boniface Parkway (the Boniface property). On July 18, 1984, Zamarello quitclaimed fifty percent of his interest in the Boniface property to his daughter, Carol Johnson. The deed was recorded in the records of the Anchorage Recording District in August of 1984.

Zamarello and Johnson wished to develop a strip mall on the Boniface property through Olympic, Inc.[1] In September of 1984, Olympic began negotiating with the Bank of California for the Bank to provide six million dollars in long-term financing to Olympic. The loan was to be secured by a first lien priority deed of trust on the Boniface property. Over a year later, in order to determine the state of the title to the Boniface property, the Bank requested a commitment for title insurance from Security Title. Security Title issued a preliminary commitment for title insurance in December of 1985 which incorrectly stated that Zamarello exclusively owned a fee simple estate in the Boniface property as of

November 27, 1985. No mention was made of Johnson's interest in the property.

The loan to Olympic was closed on December 24, 1985. Zamarello, but not Johnson, deeded the Boniface property to Olympic. The loan was secured by a deed of trust on the property; Olympic was the trustor, the Bank was the beneficiary. In connection with the loan, First American issued a policy of title insurance on the Boniface property.[2] The policy insured the Bank against damage or loss as a result of title to the Boniface property being vested otherwise than as stated in the policy, namely, in Olympic in fee simple. The premium for the policy amounted to $10,-952.75.

Olympic eventually defaulted on the note and, in August 1986, filed for reorganization under Chapter 11 of the Bankruptcy Code. In February 1987, the Bank learned of Johnson's fifty percent interest in the Boniface property. The Bank brought this action against Security Title and First American, claiming breach of contract and negligent misrepresentation.

Instead of filing an answer, First American brought suit against Johnson on behalf of the Bank. The complaint asked the court to declare that Johnson's interest in the Boniface property was subject to the terms and conditions of the deed of trust. First American and Security Title then filed a motion to dismiss the Bank's action, arguing that the Bank had not suffered the harm necessary to state a claim for relief. Opposing this motion, the Bank submitted the affidavit of its vice president, Kathleen Brown, attesting to the Bank's damages.[3]

After hearing oral argument, the superior court found that the Bank's negligence action failed to state a claim upon which relief could be granted, and that the Bank's contract claim was premature. The court issued an order granting the motion to

---

1. Zamarello was president and majority stockholder of Olympic.

2. Security Title acted as the agent for First American with respect to this transaction.

3. Brown cited three ways in which the Bank had been damaged: 1) the Bank had been placed in a disadvantageous negotiating position in the bankruptcy proceedings; 2) the Bank had been thwarted in its option to foreclose on the Boniface property because it could obtain only a one-half undivided interest, an unmarketable ownership interest; and 3) the Bank was incurring substantial legal costs in responding to the bankruptcy proceedings.

dismiss. A final judgment was entered from which the Bank now appeals.

## II.

All parties agree that appellees' motion to dismiss must be treated as a motion for summary judgment because it included matters outside the pleadings. In reviewing the trial court's grant of a motion for summary judgment, we must "determine whether there are any genuine issues of material fact, and whether the moving party is entitled to judgment as a matter of law." *Diedrich v. City of Ketchikan*, 805 P.2d 362, 365 n. 3 (Alaska 1991) (quoting *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986)). All reasonable factual inferences must be drawn in favor of the nonmoving party. *Jensen v. Ramras*, 792 P.2d 668, 669 (Alaska 1990).

The Bank sued on two separate theories: negligent misrepresentation and breach of contract. We address the trial court's dismissal of both theories in turn.

### A. *Negligent Misrepresentation.*

The Bank claims that Security Title is liable for negligently misrepresenting in its preliminary commitment that Zamarello exclusively owned the Boniface property. The Bank claims that First American is vicariously liable for Security Title's misrepresentation because Security Title was acting as First American's agent.

The question whether a title company should be liable in tort for a misrepresentation made in a preliminary commitment of title insurance has not been decided in Alaska.[4] The majority of other jurisdictions have accepted this theory of liability. *See, e.g., Moore v. Title Ins. Co. of Minn.*, 148 Ariz. 408, 714 P.2d 1303, 1306 (App.1985); *White v. Western Title Ins. Co.*, 221 Cal.Rptr. 509, 710 P.2d 309, 315 (1985); *Shada v. Title & Trust Co. of Fla.*,

457 So.2d 553, 557 (Fla.App.1984); *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P.2d 254, 266 (1976); *Malinak v. Safeco Title Ins. Co. of Idaho*, 203 Mont. 69, 661 P.2d 12, 15 (1983); *Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154, 158 (1984); *But see, e.g., Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 115 Idaho 56, 764 P.2d 423, 425–26 (Idaho 1988) *and Walker Rogge, Inc. v. Chelsea Title and Guaranty Co.*, 116 N.J. 517, 562 A.2d 208, 218 (1989) (title company owes no duty beyond that which is assumed in its title policy).

The cases which find tort liability generally stress that one function of the preliminary commitment is similar to that of the report of an abstracter of title, namely, to give interested persons knowledge concerning the state of the title so that they may plan and structure transactions concerning the property. *Ford v. Guarantee Abstract & Title Co.*, 553 P.2d at 266. This is a function distinct from that of insurance, for a title policy may be issued without a preliminary commitment and without reporting what the state of the title is.

The cases which hold that there can be no tort action for misrepresentation tend to stress solely the insurance function of title insurance:

> The end result of the relationship between the title company and the insured is the issuance of the policy. To this extent, the relationship differs from other relationships conceivably sounding in both tort and contract, such as the relationship between physician and patient, to which plaintiff alludes. Although the relationship between physician and patient is contractual in its origins, the purpose of the relationship is to obtain the services of the physician in treating the patient. The patient reasonably expects the physician to follow the appropriate standard of care when providing

4. The Bank argues that we have found such liability in *Transamerica Title Ins. Co. v. Ramsey*, 507 P.2d 492 (Alaska 1973). *Ramsey*, however, does not stand for that general proposition. Instead, we held that under the particular facts of that case the title company arguably undertook to advise its customer as to whether or not the property in question could be sold using a fourteen-year-old power of attorney, which, unbeknownst to the customer, had been revoked. The title company did not misrepresent the state of the title in the preliminary commitment which it issued.

those services. By contrast, the title company is providing not services, but a policy of insurance. That policy appropriately limits the rights and duties of the parties.

*Walker Rogge,* 562 A.2d at 220.

We agree with the authorities which hold that there may be tort liability for misrepresentations made in preliminary commitments for title insurance. In our view, such commitments provide an essential service to prospective buyers and lenders. They are told what transactions must take place before they can receive clear title or an effective security.

> Despite disclaimers, preliminary title reports are normally relied on by insureds, escrow agents, and lenders with full knowledge, and sometimes with the encouragement, of the insurance company. If the insurer actually intended the list of title defects in the preliminary report to be used just to inform the potential insured of the proposed contract terms, the list could be presented in the policy at the time it is offered to the insured, as is the case with most other types of insurance policies. Instead, the title insurance company's preliminary report is issued prior to closing of the land contract—at the same stage in the transaction as is the abstract or attorney's opinion—and the company should know that it will likely be used in the same manner.

J. Palomar, *Title Insurance Companies' Liability for Failure to Search Title and Disclose Record Title,* 20 Creighton L.Rev. 455, 480–81 (1987) (footnotes omitted). We therefore conclude that title insurance companies have a duty of care concerning the preliminary title information which they transmit to their customers.[5]

We reach the same conclusion utilizing the multi-factor analysis employed in *Howarth v. Pfeifer,* 443 P.2d 39 (Alaska 1968). We held in *Howarth* that there could be liability in tort for negligent misrepresentation "where there is a duty, if one speaks at all, to give correct information." *Id.* at 42. In considering whether such a duty should exist, we noted various factors which were summarized as follows in a later case:

> (a) whether the defendant had knowledge, or its equivalent, that the information was desired for a serious purpose and that the plaintiff intended to rely upon it;
> (b) the foreseeability of harm;
> (c) the degree of certainty that plaintiff would suffer harm;
> (d) the directness of causation; and
> (e) the policy of preventing future harm.

*Bevins v. Ballard,* 655 P.2d 757, 760–61 (Alaska 1982) (citing *Howarth,* 443 P.2d at 42). Applying these factors, we also conclude that a title insurance company has a duty to accurately communicate the state of a title when issuing a preliminary commitment for title insurance.

First, title insurance companies know that the title information which they provide is desired for a serious purpose and will be relied on. *See Chun v. Park,* 51 Haw. 462, 501, 462 P.2d 905, 906–07 (1969) (very purpose of certificate of title search is to show buyer and seller that seller had a marketable title). "[T]itle insurance is often ordered not for the insurance itself but to obtain the use of the insurer's title

---

5. This duty is not that of a guarantor; instead it is the duty to exercise reasonable care. *See* Restatement (Second) of Torts, § 552 (1977), which provides in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable case or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

plant and the expertness of its employees in handling the search process." D. Burke, *Law of Title Insurance* § 12.1, at 362 (1986). "[T]he title insurance industry leads parties, via its advertising and other practices, to rely on the preliminary title report as a guarantee of good title...." *Palomar*, *supra* at 485; *See also* J. Appleman & J. Appleman, *Insurance Law and Practice* § 5212, at 72 (1981). Security Title should have known that the Bank, in closing the loan to Olympic, would act in reliance on the statement in the preliminary commitment that title was held exclusively by Zamarello and thus conclude that only a deed from Zamarello to Olympic was necessary to properly secure the Bank's deed of trust.

The other *Howarth* factors also suggest finding a duty. Title searches are frequently required in situations involving transactions where the state of the title must be known accurately or the customer will foreseeably suffer harm which is both certain and direct. Further, the policy of preventing future harm is somewhat served by imposing a duty of care on the part of title insurers, although the deterrent supplied by tort liability is not likely to be of much additional consequence since the title company is usually liable under the title policy which ordinarily follows the preliminary commitment.

One additional factor should be noted. Alaska Statute 21.66.170 requires title insurers to conduct a "reasonable search and examination of title" before issuing a policy of title insurance.[6] Thus, imposing tort liability does not require conduct on the part of title insurers which is not already required by statute.

1.  Did Security Title's title commitment disclaim liability for negligence?

■ The preliminary commitment for title insurance states: "This report and commitment shall have no force or effect except as a basis for the coverage specified herein." We do not regard the quoted

language as an effective disclaimer of liability for negligence.

■ First, as a general rule, contractual limitations on liability for negligence must be "clearly set forth." *Dresser Indus. Inc. v. Foss Launch & Tug Co.*, 560 P.2d 393, 395 (Alaska 1977). "'If the defendant seeks ... to escape responsibility for the consequences of his negligence, then [the disclaimer] must so provide, clearly and unequivocally, as by using the word 'negligence' itself.'" *Kissick v. Schmierer*, 816 P.2d 188, 191 (Alaska 1991) (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 68 at 483–84 (5th ed. 1984)). In our view the quoted language does not clearly disclaim tort liability nor does it clearly state that the title company will not be liable even if it is negligent.

■ Further, we agree with the decision of the California Supreme Court in *White v. Western Title Ins. Co.*, 221 Cal.Rptr. 509, 710 P.2d 309, 315–16 (1985), which held that a similar disclaimer in a preliminary title report was invalid: "A title company is engaged in a business affected with the public interest and cannot, by an adhesory contract, exculpate itself from liability for negligence." *See also Municipality of Anchorage v. Locker*, 723 P.2d 1261, 1265–66 (Alaska 1986) (exculpatory clauses are unconscionable where "circumstances indicate a vast disparity of bargaining power coupled with terms unreasonably favorable to the stronger party").

2.  Does First American's title policy preclude tort claims until the title companies have had an opportunity to cure the title defect?

■ The appellees also argue that clause 7 of the policy, taken in conjunction with clause 11 precludes any claim in tort until the curative action brought against Johnson is resolved. Paragraph 11 of the policy provides:

---

**6.** In declining to impose tort liability on the title insurer, the Idaho Supreme Court explicitly "f[ound] it significant" that Idaho's equivalent to AS 21.66.170 does not mandate a "reasonable"

search. *Brown's Tie*, 764 P.2d at 427 ("We find it significant that the Idaho Legislature, unlike other states [such as Alaska], has chosen to omit the word 'reasonable.'").

Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or any action asserting such claim, shall be restricted to the provisions and conditions and stipulations of this policy.

Paragraph 7 of the policy provides:

No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance, or establishes the title, or the lien of the insured mortgage, as insured, within a reasonable time after receipt of such notice; (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured, as provided in paragraph 3 hereof; or (c) for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.

We do not find that these clauses prohibit the present maintenance of a tort action. Assuming that paragraph 11 applies to tort claims based on misrepresentations made before the policy was issued, paragraph 11 does no more than trigger the need to review the policy provisions to see if any of them apply. In our view, paragraph 7 of the policy does not apply because it explicitly pertains only to claims arising "under this policy." The Bank's misrepresentation claim is based on the preliminary commitment rather than the title policy.

### 3. Has the Bank suffered damages?

■ First American argues that summary judgment was proper because the Bank cannot adequately establish damages. According to First American, the curative action brought against Johnson might succeed and thus "at this juncture ... it has not yet been determined whether the Bank

has been harmed." However, the Bank has submitted the affidavit of its vice president attesting to its various damages.[7] If at some point these damages are eliminated, dismissal of the tort action might be proper. However, that may never occur and the validity of the Bank's action does not depend on that eventuality.

Because the Bank stated a valid claim for negligent misrepresentation, the superior court's grant of summary judgment on this count must be reversed.

### B. *Breach of contract.*

■ The superior court dismissed the Bank's breach of contract claim, reasoning in part that it was premature. We affirm.

Although the Bank may indeed have incurred damages which cannot be cured by the litigation against Johnson, the Bank nevertheless agreed to a policy which contains a curative provision in paragraph 7.[8] Paragraph 7 provides that the Bank cannot maintain any claim under the policy until First American has had a reasonable time to cure the title defect. It does not except from its ambit claims for damages which will exist even if the defect is cured. Thus, the trial court did not err in granting summary judgment on the Bank's contract claim.

The order granting summary judgment on the Bank's contract claim is interlocutory in nature, given the existence of a viable claim for negligent misrepresentation in tort. Alaska Civil Rule 54(b) provides that where there are multiple claims, judgment as to fewer than all claims can become final only upon "an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Where such determination and direction are absent, "any order or other form of decision, however designated, which adjudicates fewer than all of the claims ... shall not terminate the action as to any of the claims ... and the order or other form of decision is subject to revision at any time" before the entry of

---

7. *See supra* note 3.

8. *See supra* at 1131.

final judgment. Since the tort and contract claims are closely related in the present case, and since it does not appear that either party will suffer hardship if the contract claim adjudication is not made final immediately on remand, we doubt that the determination and direction required by Civil Rule 54(b) would be appropriate. *See Johnson v. State,* 577 P.2d 706, 710–11 (Alaska 1978) (Civil Rule 54(b) certification an abuse of discretion where issues were closely related and neither party would suffer hardship from delay).

## CONCLUSION

The judgment of the superior court dismissing this action is REVERSED. This case is REMANDED[9] for further proceedings consistent with this opinion.

---

9. One option which the court may wish to consider on remand is to stay both of the Bank's claims pending the outcome of the cure litigation.