JOHN C. TESS, APPELLANT, V. LAWYERS TITLE INSURANCE CORPORATION, A VIRGINIA CORPORATION, AND DAKOTA TITLE AND ESCROW CO., APPELLEES.

557 N.W.2d 696

Filed January 17, 1997. No. S-95-608.

Vicki L. Boone, of Gunderson Law Offices, on brief for appellant.

Robert J. Becker, of Stalnaker, Becker, Buresh, Gleason & Farnam, P.C., for appellees.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

GERRARD, J.

Appellant, John C. Tess, seeks further review from the Nebraska Court of Appeals' summary dismissal of his appeal of a district court order sustaining summary judgment in favor of appellees, Lawyers Title Insurance Corporation and Dakota Title and Escrow Co. For the reasons stated herein, we conclude that the district court order sustaining appellees' motion for summary judgment, which in effect completely dismissed from the lawsuit one of two defendants and completely dismissed one of two causes of action pled, is a final, appealable order. As such, the Court of Appeals erred in summarily dismissing Tess' appeal. However, upon consideration of the merits, we affirm the judgment of the district court.

## I. FACTUAL BACKGROUND

In the summer of 1986, Tess and his now former wife entered into negotiations with Herbert Osborne, now deceased, a real estate broker and developer, for the purchase of an 80-acre tract of land located on what was at that time the northwest outskirts of Omaha. Unable to afford the entire tract, Tess offered to purchase a 20-acre portion located on the corner of 168th Street and West Maple Road. Osborne readily agreed to Tess' proposal, as he had other prospective buyers interested in purchasing 10-acre portions of the same tract.

Osborne acted in several capacities during this transaction. He was the seller and trustee of the property, as well as Tess' lender and real estate agent. In addition, Osborne and his partner, Charles Rasmussen, were longtime clients of Dakota Title. On September 3, 1986, Osborne submitted an application for title insurance with respect to the property Tess intended to purchase to Dakota Title, the local agent for Lawyers Title. On this application, Osborne indicated that the parties to be insured were John C. and Maureen C. Tess.

The title insurance commitment issued to Osborne stated an effective date of September 9, 1986, and failed to recite that the parcel of land at issue was subject to any protective covenants. Further, the title insurance commitment provided that Dakota Title was to be notified prior to the closing of the transaction, so

that the status of title could be updated. Tess does not recall ever receiving the title insurance commitment.

Notwithstanding the fact that the title insurance commitment recited an effective date of September 9, 1986, a Dakota Title document described as a title binder search sheet and bearing the initials "EP" indicates that the title search on the property at issue was in fact conducted on September 11. Edwin Peabody, Dakota Title's former vice president and a licensed abstracter and title agent, claimed to have no recollection of the specific facts concerning this title search. However, Peabody explained the likely reason for the discrepancies between the effective date of the commitment for title insurance and the date the search was conducted in this matter was that Dakota Title would normally backdate title insurance commitments to reflect the delay expected between the recording of an instrument and its appearance in the index of the register of deeds.

The record also reflects that on the same day Dakota Title conducted its title search in regard to Tess' property, Osborne and Rasmussen executed protective covenants with respect to the entire 80-acre tract of land at issue. Peabody notarized the execution of these protective covenants. The covenants recite that they are to run with the land and bind all present and future owners. The covenants provide, in pertinent part, that the properties may only be used for residential and farming purposes, and specifically proscribe commercial farming and restrict the number of horses and ponies permitted on each lot. The covenants were recorded on September 12, 1986.

When Osborne divided the 80-acre tract for sale, he parceled out Tess' 20 acres and five other tracts roughly 10 acres each. Dakota Title prepared title insurance commitments for each of these tracts at approximately the same time it prepared the title insurance commitment for Tess. Only the commitments prepared listing Tess and his then father-in-law and mother-in-law as insureds failed to report the existence of the protective covenants. Title insurance commitments listing all of the other purchasers as insureds, all with the effective dates of September 11, 1986, recite the existence of the protective covenants even though the covenants were not recorded until September 12.

Tess was not represented by an attorney during this sale. Instead, Tess said he relied on Osborne, as the experienced real estate professional, to be fair and aboveboard during the entire transaction. At closing on October 1, 1986, Tess admitted seeing a warranty deed executed in his favor which recited that the property was subject to protective covenants of record. Tess said that he questioned Osborne about the covenants and told Osborne that he wanted to retain an attorney before proceeding. According to Tess, Osborne persuaded him that he did not need to hire an attorney and that the covenants did not apply to his 20-acre parcel, but instead pertained only to the 10-acre parcels. Tess closed on the property on October 1.

Dakota Title was not notified of the real estate closing date and did not conduct an updated search of title prior to the closing. The Lawyers Title insurance policy issued with Tess as the insured, effective October 7, 1986, notes Tess' recorded deed and mortgage of October 7, but the protective covenants are not shown as exceptions on the policy.

From 1986 to 1993, Tess lived in the farmstead house on the property and operated a boarding stable. In late 1992, Tess was approached by a representative of Emeth, Inc., and entered into negotiations for the sale of his property. When Emeth discovered the existence of the protective covenants on the eve of closing, it backed out of a proposed sale.

Tess filed suit against Lawyers Title and Dakota Title alleging two causes of action: (1) breach of the contract for title insurance and (2) negligence in regard to appellees' failure to either discover or disclose the existence of the protective covenants. On September 26, 1994, Dakota Title moved the court for summary judgment, and Lawyers Title moved the court for partial summary judgment. The district court granted Dakota Title's motion for summary judgment with respect to the breach of contract cause of action. The court found Dakota Title acted solely as a disclosed agent for Lawyers Title with respect to the purchase of title insurance and made no attempt to bind itself. The court overruled the motions with respect to the negligence cause of action.

Subsequently, on January 31, 1995, both appellees moved the court for summary judgment with respect to the negligence

cause of action. On May 4, the district court sustained appellees' motion. The court found that the commitment for title insurance accurately reflects the public record as of its effective date, September 9, 1986; therefore, as a matter of law, appellees were not negligent in its preparation. Further, Dakota Title was only under a duty to update the title status prior to closing upon notification by one of the parties. Because no one provided such notification, Dakota Title was without a duty to update the title status. Finally, the court found that Tess did not rely on Dakota Title's search of the record to establish marketable title at the time of closing. Instead, Tess relied on Osborne's representations.

The result of the district court order sustaining summary judgment was to effect a complete dismissal of Dakota Title as a party to the suit and the complete dismissal of Tess' negligence cause of action. Thus, the only matter pending before the district court is Tess' cause of action for breach of the insurance contract with respect to Lawyers Title.

Tess timely appealed the district court's May 4, 1995, order. The Court of Appeals summarily dismissed Tess' appeal, finding it lacked jurisdiction because the district court order was not a final order. See *Tess v. Lawyers Title Ins. Corp.*, 3 Neb. App. xlix (case No. A-95-608, July 13, 1995).

## II. SCOPE OF REVIEW

When a jurisdictional question does not involve a factual dispute, its determination is a matter of law, which requires an appellate court to reach a conclusion independent from the decisions made by the lower courts. *City of Lincoln v. Twin Platte NRD*, 250 Neb. 452, 551 N.W.2d 6 (1996).

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Larkin v. Ethicon, Inc., ante* p. 169, 556 N.W.2d 44 (1996).

## III. ASSIGNMENTS OF ERROR

Tess asserts that the Court of Appeals erred in dismissing the instant appeal because complete dismissal of one of multiple

defendants in a suit is a final order with respect to that defendant, and complete dismissal of one of two separate causes of action is a final order with respect to that cause of action.

In regard to the merits of his appeal, Tess claims that the district court erred (1) in finding that as a matter of law, appellees were not negligent and that Tess did not rely on appellees in purchasing the property at issue, and (2) in overruling Tess' motion for a continuance of the summary judgment hearing.

## IV. ANALYSIS

### 1. JURISDICTION

#### (a) Dismissal of Dakota Title as Party Defendant

For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. Conversely, an appellate court is without jurisdiction to entertain appeals from nonfinal orders. *Currie v. Chief School Bus Serv.*, 250 Neb. 872, 553 N.W.2d 469 (1996); *City of Lincoln v. Twin Platte NRD, supra.* Three types of final orders may be reviewed on appeal: (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after a judgment is rendered. Neb. Rev. Stat. §§ 25-1902 and 25-1911 (Reissue 1995); *Currie v. Chief School Bus Serv., supra; Rohde v. Farmers Alliance Mut. Ins. Co.*, 244 Neb. 863, 509 N.W.2d 618 (1994); *Jarrett v. Eichler*, 244 Neb. 310, 506 N.W.2d 682 (1993). However, to be final, an order must dispose of the whole merits of the case. When no further action of the court is required to dispose of a pending cause, the order is final. If the cause is retained for further action, the order is interlocutory. *Olsen v. Olsen*, 248 Neb. 393, 534 N.W.2d 762 (1995).

In *Currie v. Chief School Bus Serv., supra*, we held that a district court order sustaining the defendant's motion for summary judgment which dismissed the plaintiff's negligence claim with prejudice is a final, appealable order because it affects substantial rights of the plaintiff and was made during a special proceeding, notwithstanding the fact the district court still had pending before it the defendant's counterclaim.

Tess asserts that the May 4, 1995, district court order was a final, appealable order because, in effect, it dismissed with prejudice his negligence cause of action against both appellees and, at the same time, dismissed with prejudice Dakota Title as a defendant in the lawsuit.

Appellees argue that the district court order was not a final, appealable order because the court did not completely dispose of all matters alleged in the suit. Tess may protect his interest by appealing the court's order at the conclusion of the litigation with respect to Tess' contract cause of action against Lawyers Title still pending before the district court.

In *Green v. Village of Terrytown*, 188 Neb. 840, 199 N.W.2d 610 (1972), we held that an order which effects a dismissal with respect to one of multiple defendants in a negligence action was a final, appealable order as to the defendant dismissed. In *Green*, this court recognized the competing interests at stake.

[A] paramount consideration is to be liberal in permitting appeals, but, on the other hand, that piecemeal or successive appeals are not desirable. It would appear there is a further consideration, namely that where there are multiple defendants and the action is dismissed as to one defendant, that defendant no longer has a voice in the determination of the litigation and if the remaining parties permit the litigation to drag on for months or years, he has no way of bringing an end to the litigation or ascertaining whether or not it has been finally determined as to him. This is a very important consideration in determining whether or not such an order of dismissal is a "final order."

*Id.* at 841, 199 N.W.2d at 611.

*Green* controls the instant case. The district court order sustaining appellees' motion for summary judgment completely dismissed Dakota Title from the lawsuit. Accordingly, the order was a final, appealable order, and Tess is correct to assert that the Court of Appeals erred in dismissing his appeal in regard to Dakota Title.

### (b) Dismissal of Negligence Cause of Action Against Both Appellees

Furthermore, Tess correctly asserts that complete dismissal with prejudice of one of multiple causes of action is a final,

appealable order as to that cause of action. In *Interholzinger v. Estate of Dent*, 214 Neb. 264, 333 N.W.2d 895 (1983), we held that an order sustaining the defendant's motion for summary judgment which dismissed the plaintiff's cause of action for alleged legal malpractice was a final, appealable order notwithstanding the fact that the separate and distinct cause of action for money had and received remained pending for trial. However, the *Interholzinger* court was careful to distinguish separate causes of action from different theories of recovery. Thus, if Tess pled separate causes of action as opposed to different theories of recovery, the district court order was a final, appealable order with respect to his negligence claim.

In *Interholzinger v. Estate of Dent, supra*, the plaintiff sued the estate of his attorney, alleging professional negligence on the part of the attorney concerning the manner in which he attempted to sell the plaintiff's business. The plaintiff also pled a cause of action for money had and received by the deceased attorney. In *Interholzinger*, we found this to be two separate causes of action, as the causes are based on two separate factual occurrences: the receipt and holding of money, and the performance of legal services.

Similarly, in *Ravenna Bank v. Custom Unlimited*, 223 Neb. 540, 391 N.W.2d 557 (1986), this court found a petition which alleged default on a promissory note by a partnership and enforcement of a guarantee of that debt by an individual partner to constitute two causes of action. Even though both causes were based on one debt, because a guarantee is a collateral undertaking by one to answer for the debt of another, the petition in fact described two transactions.

In contrast, in *P. R. Halligan Post 163 v. Schultz*, 212 Neb. 329, 322 N.W.2d 657 (1982), the plaintiff filed suit against the parents of a 13-year-old boy to recover damages to a building caused by a fire set by the child. The petition alleged two purported causes of action: parental liability for the willful and intentional acts of a child, and negligent supervision of the child. This court held dismissal of the first "cause of action" was not a final, appealable order, as both "causes of action" were instead merely different theories of recovery arising out of the same factual circumstances involving the same parties.

The instant case is controlled by the *Interholzinger* and *Ravenna Bank* cases. Here, Tess alleges that in 1986, appellees negligently failed to either discover or disclose in a title commitment protective covenants affecting property he intended to purchase, and later in 1994, Lawyers Title failed to indemnify him pursuant to the terms of the title insurance policy. Tess does not allege one set of operative facts from which all damages flow. Instead, he has alleged the occurrence of two separate transactions. The operative facts regarding the negligence cause of action commenced on September 11, 1986, and concluded on or about the October 1 closing date (i.e., failure to discover or disclose protective covenants in title commitment). The operative facts regarding the contract cause of action commenced with the issuance of the title insurance policy on October 7 and continue until the time of trial (i.e., failure to indemnify insured for damage by reason of defect or unmarketability of title for use intended by Tess). As such, we conclude that Tess has pled two causes of action, not two theories of recovery. Accordingly, the Court of Appeals erred in determining that the district court order was not a final, appealable order with respect to the complete dismissal with prejudice of Tess' negligence cause of action against both appellees.

## 2. SUMMARY JUDGMENT

Having determined the jurisdictional issue, we proceed to the merits of the appeal. In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Larkin v. Ethicon, Inc., ante* p. 169, 556 N.W.2d 44 (1996). The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Melick v. Schmidt, ante* p. 372, 557 N.W.2d 645 (1997).

In order to succeed in an action based on negligence, a plaintiff must establish the defendant's duty, a breach of that duty, proximate causation, and damages. *Hand v. Starr*, 250 Neb. 377, 550 N.W.2d 646 (1996).

## (a) Duty of Title Insurance Company

At the outset, it should be noted that Tess' negligence claim is based upon alleged acts or omissions in the preparation of the "September 9" title insurance commitment and not upon any responsibility imposed on the title insurance company on account of its October 7, 1986, policy of insurance. The title insurance commitment, oftentimes referred to as a binder, is not a title policy. As in the instant case, it is often in the form of a preliminary report on the status of the title. As such, it is issued at the end of the title search process undertaken by the insurer. D. Barlow Burke, Jr., Law of Title Insurance § 15.2 (2d ed. 1993). In contrast, title insurance is a contract for indemnity under which the insurer is obligated to indemnify the insured against losses sustained in the event that a specific contingency, e.g., the discovery of a lien or encumbrance affecting title, occurs. See *Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154 (1984).

In *Heyd v. Chicago Title Ins. Co.*, 218 Neb. at 303, 354 N.W.2d at 158-59, we held that

a title insurance company which renders a title report and also issues a policy of title insurance has assumed two distinct duties. In rendering the title report the title insurance company serves as an abstracter of title and must list all matters of public record adversely affecting title to the real estate which is the subject of the title report. When a title insurance company fails to perform its duty to abstract title accurately, the title insurance company may be liable in tort for all damages proximately caused by such breach of duty. A title insurance company's responsibility for its tortious conduct is distinct from the insurance company's responsibility existing on account of its policy of insurance. Different duties and responsibilities imposed on the title insurance company, therefore, can be the basis for separate causes of action—one cause of action in tort and another in contract.

In the instant case, Tess claims that Dakota Title is liable for either failing to discover or failing to disclose in its title insurance commitment the existence of protective covenants when Dakota Title had actual knowledge of such protective

covenants. Tess claims that Lawyers Title is vicariously liable for Dakota Title's misrepresentation because Dakota Title was acting as Lawyers Title's agent.

This case presents the question whether a title company has a duty to report known, but as yet unrecorded, matters affecting title to the real estate in a preliminary title insurance commitment. A majority of other jurisdictions have accepted the theory that a title company should be liable in tort for a misrepresentation made in a preliminary commitment of title insurance. See, e.g., *Bank of California v. First American*, 826 P.2d 1126 (Alaska 1992); *Moore v. Title Ins. Co. of Minnesota*, 148 Ariz. 408, 714 P.2d 1303 (Ariz. App. 1985); *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 710 P.2d 309, 221 Cal. Rptr. 509 (1985); *Shada v. Title & Trust Co. of Fla.*, 457 So. 2d 553 (Fla. App. 1984); *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P.2d 254 (1976); *Malinak v. Safeco Title Ins. Co. of Idaho*, 203 Mont. 69, 661 P.2d 12 (1983). But see, e.g., *Brown's Tie & Lumber v. Chicago Title*, 115 Idaho 56, 764 P.2d 423 (1988); *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 562 A.2d 208 (1989) (title company owes no duty beyond that which is assumed in its title policy).

The cases which find tort liability generally stress that one function of the preliminary commitment is to give interested persons knowledge concerning the state of the title so that they may plan and structure transactions concerning the property. See *Ford v. Guarantee Abstract & Title Co., supra.* This is a function distinct from that of insurance, for a title policy may be issued without a preliminary commitment and without reporting what the state of the title is. *Bank of California v. First American, supra.*

We agree with the authorities which hold that there may be tort liability for misrepresentations made in preliminary commitments for title insurance. In our view, the same reasoning would impose a duty upon a title company to report to interested persons known, but as yet unrecorded, matters affecting title to the real estate in a preliminary title insurance commitment. Such preliminary title insurance commitments provide an essential service to prospective buyers and lenders in this state. They are told what transactions must take place before they can

receive clear title or an effective security. *Bank of California v. First American, supra.*

> Despite disclaimers, preliminary title reports are normally relied upon by insureds, escrow agents, and lenders with full knowledge, and sometimes with the encouragement, of the insurance company. If the insurer actually intended the list of title defects in the preliminary report to be used just to inform the potential insured of the proposed contract terms, the list could be presented in the policy at the time it is offered to the insured, as is the case with most other types of insurance policies. Instead, the title insurance company's preliminary report is issued prior to closing of the land contract—at the same stage in the transaction as is the abstract or attorney's opinion—and the company should know that it will likely be used in the same manner.

Joyce Dickey Palomar, *Title Insurance Companies' Liability for Failure to Search Title and Disclose Record Title*, 20 Creighton L. Rev. 455, 480-81 (1987). We therefore hold that title insurance companies and their agents are required to exercise the degree of skill and knowledge normally possessed by members of the profession in good standing in the locality concerning preliminary title information which is transmitted to their customers.

The above-stated duty is not that of a guarantor; instead, it is the duty to exercise reasonable care. See Restatement (Second) of Torts § 552 at 126-27 (1977), which provides in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the

information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Appellees assert that our holding in *Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154 (1984), was abrogated in 1985 when the Legislature passed the Abstracters Act, Neb. Rev. Stat. §§ 76-535 through 76-558 (Reissue 1990 & Cum. Supp. 1994), and defined those matters which constitute a "report of title." Section 76-537(9) provides that a "report of title" shall not include a title insurance commitment or policy. Appellees claim that since a title insurance commitment is neither an abstract of title nor a "report of title," an "abstracter's duty" can no longer arise from the issuance of a title insurance commitment. This argument is misplaced, as the duty announced herein is one of reasonable care under the circumstances and not an "abstracter's duty" as set forth in *Heyd*.

Further, appellees assert that because the commitment for title insurance accurately reflected all matters of public record as of its effective date, September 9, 1986, there could be no breach of duty.

This assertion, however, ignores Tess' claim that Dakota Title had *actual notice* of the protective covenants at issue when it conducted its title search for his title insurance commitment. Peabody, Dakota Title's vice president, notarized the protective covenants executed by Osborne and Rasmussen on the same day that an agent for Dakota Title with the initials "E.P." conducted the title search with respect to Tess' property. Further, the protective covenants are noted on all other title insurance commitments prepared for the buyers of the 10-acre parcels—except the commitment prepared for Tess' father-in-law and mother-in-law. These other title insurance commitments were prepared contemporaneously with Tess' title insurance commitment.

The evidence construed in a light most favorable to Tess reveals that appellees were on actual notice of something outside the record which clearly affected title, as Dakota Title had actual knowledge of the protective covenants at the time it pre-

pared the preliminary commitment for title insurance. Here, an issue of material fact existed regarding the knowledge that appellees possessed at the time they prepared the preliminary title commitment and whether appellees' failure to note the protective covenants in the preliminary commitment for title insurance breached their duty as a title insurer rendering a preliminary title commitment. As such, it would be erroneous for the district court to grant appellees' motion for summary judgment, unless the court properly concluded as a matter of law that appellees' alleged breach of duty was not a proximate cause of Tess' damages.

### (b) Proximate Cause

Appellees assert and the district court found that Tess did not rely on the title insurance commitment in deciding to proceed with the transaction. Instead, Tess relied on Osborne's assurances that the protective covenants referenced in the warranty deed only applied to the 10-acre parcels. Thus, appellees' negligence, if any, did not cause Tess' damages.

The issue of proximate cause, in the face of *conflicting evidence*, is ordinarily a question for the trier of fact. *World Radio Labs. v. Coopers & Lybrand, ante* p. 261, 557 N.W.2d 1 (1996). The evidence regarding causation is not in conflict. The president of Dakota Title, by way of affidavit, asserted that a copy of the title insurance commitment was sent to Osborne and was not sent to Tess. By deposition, Tess testified that he did not recall receiving or seeing a title insurance commitment prior to, or at the time of, closing on October 1, 1986. There is simply no evidence in the record that Tess saw the title insurance commitment, much less relied upon any representations made in the commitment.

In *Lawrence v. Chicago Title Ins. Co.*, 192 Cal. App. 3d 70, 77, 237 Cal. Rptr. 264, 268 (1987), the court aptly stated: "Even if the preliminary report constitutes a representation of title upon which the recipient is entitled to rely, a claim of negligence must be predicated upon the insured's *actual reliance* on the report." (Emphasis supplied.) See, also, *Muhlenkort v. Union County Land Trust*, 530 N.W.2d 658 (S.D. 1995). We agree. The evidence establishes, as a matter of law, that Tess did

not see the title insurance commitment prior to closing and did not rely upon any representations in the commitment in deciding to proceed to closing in this matter. As such, we determine that any alleged acts of appellees in failing to note the protective covenants in the preliminary commitment for title insurance are not the proximate cause of any damages to Tess.

Tess also claims that the district court erred in failing to grant a continuance to allow Tess an opportunity to elicit expert testimony with regard to the issue of appellees' duty and breach thereof. In light of our determination regarding proximate cause, it is unnecessary to consider this assignment of error.

## V. CONCLUSION

The judgment of the Court of Appeals is thus reversed, and the cause remanded thereto with the direction that it affirm the May 4, 1995, judgment of the district court with regard to the negligence cause of action. As noted in part I, Tess' cause of action for breach of contract with respect to Lawyers Title is pending in the district court.

REVERSED AND REMANDED WITH DIRECTION.

LANPHIER, J., concurring.

I concur. The majority states, on the issue of proximate causation, that Tess did not rely upon any representations made in the title commitment. I agree that Tess did not see the title insurance commitment.

Tess *did* however rely on the statements of his agent, Osborne, regarding the title insurance commitment. Osborne was sent a copy of the title insurance commitment. Osborne also persuaded Tess that he did not need to hire an attorney and that the covenants did not apply to his 20-acre parcel, but, instead, pertained only to the 10-acre parcels.

Further, Osborne acted as a dual agent by functioning as seller and trustee of the property as well as Tess' lender and real estate agent. Under Nebraska law, notice or knowledge of a dual agent is imputed to and binds the principal to whom such notice or knowledge would be imputed if the agent represented him alone. See *Thomas v. Jarecki*, 109 Neb. 549, 191 N.W. 669 (1922). Thus, Osborne's notice and knowledge of the title insurance commitment is imputed to Tess. Tess' reliance on

Osborne's statements establishes actual reliance on the document which supports Tess' claim of negligence.

However, Neb. Rev. Stat. § 76-537(9) (Cum. Supp. 1994) provides that a report of title does not include a title insurance commitment; therefore, no abstracter's duty arises. In the absence of a duty, there is no negligence.

CAPORALE, J., joins in this concurrence.