# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**JOHN P. REED**
**JONATHAN E. HALM**
Abrahamson, Reed & Bilse
Hammond, Indiana

ATTORNEY FOR APPELLEE:

**JOHN R. HALSTEAD**
Querrey & Harrow
Merrillville, Indiana



FILED
Mar 07 2012, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

RONALD E. IZYNSKI and LINDA IZYNSKI, )
Husband and Wife, and RONALD E. IZYNSKI )
and LINDA IZYNSKI, Successors by Assignment )
to Charles P. Ashton, and Charles P. Ashton and )
Frederick M. Cuppy as Co-Trustees of the )
Joyce W. Ashton Trust, as Amended, )
                                     )
     Appellants-Plaintiffs, )
                                      )
         vs. )     No. 45A04-1106-PL-277
                                      )
CHICAGO TITLE INSURANCE COMPANY, )
                                      )
     Appellee-Defendant. )

---

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Diane Kavadias Schneider, Judge
Cause No. 45D01-0504-PL-45

---

**March 7, 2012**

**OPINION - FOR PUBLICATION**

**MAY, Judge**

Ronald and Linda Izynski bought real estate in Porter County from Charles Ashton. The land was burdened with an easement that was publicly recorded but was not indicated on numerous versions of a title commitment issued by Chicago Title Insurance Company (Chicago Title). The Izynskis sued Chicago Title for breach of contract and negligence, and after a bench trial the trial court found for Chicago Title. We reverse and remand.

## FACTS AND PROCEDURAL HISTORY

Patrick McLane contracted to buy certain real estate from Ashton. Chicago Title issued title commitments[1] for the proposed McLane transaction. It issued the first and second commitments in May 2003 in connection with the McLane transaction. The Izynskis entered into their purchase agreement for the Ashton property four months later. Pursuant to that agreement Ashton was to provide the Izynskis with a commitment for title insurance in order to insure the Izynskis had marketable title. Chicago Title then issued to the Izynskis a series of title commitments.

None of the commitments it issued before the Izynskis agreed to purchase the property showed a fifty-foot-wide easement ("the 1979 easement") running across the property to

---

[1] A title commitment is a document that describes the property as the title insurer is willing to insure it and contains the same exclusions and general and specific exceptions as later appear in the title insurance policy. *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147, 149 (Wis. 1992). Ordinarily a commitment is ordered by the seller for the purpose of exhibiting it to the buyer as a representation of the quality of the title seller expects to sell to the buyer. *Malinak v. Safeco Title Ins. Co. of Idaho*, 661 P.2d 12, 15 (Mont. 1983). A title commitment naturally contemplates a search by the title insurer of the chain of title, an opinion by an expert of what the search reveals, a guaranty that the search was accurate and that the title commitment expresses the quality of the title of the seller as shown by the record. *Id*. The person who seeks a title insurance commitment expects to obtain a professional title search, as well as a professional legal opinion as to the condition of the title and a guaranty that the title expressed in the commitment will be insured to the extent of the policy coverage. *Id*. The title insurer does not agree to clear the title; rather by its commitment, the title company agrees to afford coverage in a title policy later to be issued insuring the title according to its commitment. *Id*.

provide access for repair and maintenance of a dam. The easement was at all times publicly recorded, but Chicago Title either did not find it in its title search or did not disclose it to the Izynskis. The conveyance of the property was to be by "general Warranty Deed . . . subject to all special exceptions which will be contained in the title insurance policy" unless the parties agreed otherwise. (App. at 311.)

Chicago Title prepared a third revised commitment dated September 23, 2003, the day after the Izynskis entered into the purchase agreement. It was the same as the earlier commitments issued to McLane but handwritten changes indicated, among other things, the Izynskis were now the buyers. It showed an effective date[2] of August 14 and there was an indication it was printed October 10. It was sent by fax to the Izynskis' counsel October 27. A fourth revision was dated November 3. None of these four revisions to the commitments indicated the fifty-foot easement across the property, nor did they indicate certain buildings on the property encroached on the easement.

While the commitments did not show the 1979 easement, they did show an agreement Ashton and the Shorewood Corporation entered into in 1972 captioned "Agreement for Exchange of Land and for Granting Flowage Easement." (*Id*. at 428) ("the 1972 agreement"). It provided the parties contemplated the construction of a dam and lake, part of which would be on the Ashton property. Access to the dam would be difficult due to a conveyance of land from Shorewood to Ashton, so the agreement provided Ashton would "provide or permit some reasonable access" to the dam "if [Shorewood] shall require such

---

[2] Testimony indicated such documents are back-dated to reflect when the title search was completed.

3

access in the future." (*Id*. at 430.)   This agreement was listed on every commitment Chicago Title issued to McLane and the Izynskis.

On September 22, 2003, the day before the scheduled closing, Ronald Izynski learned of the 1979 easement in a conversation with the manager of the Shorewood property owners' association.  Ronald Izynski told the real estate agent he would not close until he learned more about the easement.  Ashton demanded the Izynskis proceed with the closing and threatened to sue the Izynskis for nearly $70,000 if the closing did not take place by October 31, 2003.  Ashton, the Izynskis, and the property owners' association agreed to move the easement so the existing buildings would no longer encroach on it.  The new location of the easement limits the Izynskis' ability to use one of the lots where they had contemplated building.  The Izynskis testified the value of their property was therefore diminished.  The Ashtons reduced the purchase price by $5,000.

Other events delayed the closing.  On September 26, 2003, Chicago Title learned Joyce Ashton had died over a year earlier, which meant an estate had to be opened so its trustee could consent to the sale; those issues were resolved November 7.  The week after that, Chicago Title issued a fifth revised commitment, which showed, for the first time, the encroachment on the easement.  It also included an endorsement "insuring over the encroachment."[3]  (Appellant's Br. at 13.)  The sale to the Izynskis closed on April 15, 2004,

---

[3]  Both parties refer to the agreement to "insure over" the encroachment, but neither party explains the meaning or significance of such an agreement.  The page of the record to which the Izynskis directs us to support their statement Chicago Title agreed to "insure over" the encroachment provides Chicago Title would insure the Izynskis "against loss . . . by reason of the entry of a final judgment  . . . ordering the removal of the improvements now located on the land as the result of [the encroachment on the easement]."  (App. at 412.)

and Chicago Title was paid $1545.00 in title insurance premiums.

## DISCUSSION AND DECISION

When, as in the case before us, the trial court finds the facts specially and states its conclusions thereon pursuant to Ind. Trial Rule 52, the reviewing court will not set aside the findings or judgment unless clearly erroneous, and due regard is given to the opportunity of the trial court to judge the credibility of the witnesses. *McGinley-Ellis v. Ellis*, 638 N.E.2d 1249, 1252 (Ind. 1994). The purpose of special findings is to provide the parties and the reviewing courts with the theory on which the judge decided the case in order that the right of review for error may be effectively preserved. *Id*. Accordingly, courts reviewing judgments entered under T.R. 52 are not at liberty simply to determine whether the facts and circumstances contained in the record support the judgment. Rather the evidence must support the specific findings, which in turn must support the judgment. *Id*. If the findings and conclusions, even when construed most favorably to the judgment, are clearly inconsistent with it, the decision must be set aside regardless of whether the record contained evidence that would have been sufficient to sustain the decision. *Id*.

1.      Breach of Contract

The Izynskis asserted in their complaint that the various errors in the title commitment represented both negligence on Chicago Title's part and a breach of its contract with them. The trial court found the Izynskis were "in contractual privity with [Chicago Title] by virtue of the existence of the preliminary title commitment and *the final policy* issued by Chicago

5

Title to the Izynskis."[4] (App. at 24) (emphasis added). Because Chicago Title and the Izynskis had a contract, the court said, no tort action was available to the Izynskis: "[U]nder the Indiana Supreme Court's holding in [*U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742 (Ind. 2010)], they have no claim for negligent misrepresentation and are relegated to their contractual remedies." (*Id.*)

That was error. While the Izynskis and Chicago Title presumably had a contractual relationship with regard to the title insurance policy Chicago Title ultimately issued when the Izynskis bought the property, it does not appear there could have been contractual privity between those parties when the Izynskis entered into the agreement to buy the property from Ashton. As noted above, the first three in the series of erroneous title commitments were issued to a different prospective buyer, McLane. On September 23, 2003, the day *after* the Izynskis signed the purchase agreement, the title commitment issued to McLane was revised to reflect it was being issued to the Izynskis. Therefore, we agree with Chicago Title that "the Izynskis did not rely on any Chicago Title commitment *issued to them* when they entered into the purchase agreement."[5] (Appellee's Br. at 33) (emphasis added). As there was no contractual relationship between the Izynskis and Chicago Title when the Izynskis entered into the agreement to purchase Ashton's property, Chicago Title could not be liable for

---

[4] As the Izynskis' complaint does not appear to address the "final policy," we need not address whether the Izynskis and Chicago Title were in contractual privity at some point after the Izynskis entered into the agreement to buy Ashton's property.

[5] The trial court found the Izynskis were not reasonable to rely on a title commitment that was issued to someone else. (App. at 30.) We decline to hold the name on the caption of a title commitment document is necessarily more important than the substantive information about the property included therein, and we therefore decline to hold reliance on such a document is unreasonable.

breach of contract.

2.      Negligent Misrepresentation

In *Integrity*, 929 N.E.2d at 746, our Indiana Supreme Court addressed, in the context of an action for negligent misrepresentation, the duty of a title commitment issuer, separate and apart from the contractual obligations of the title policy. It noted

> preliminary commitments for title insurance . . . provide an essential service to prospective buyers and lenders. They are told what transactions must take place before they can receive clear title or an effective security. We agree with the authorities which hold that there may be tort liability for misrepresentations made in preliminary commitments for title insurance. In our view, such commitments provide an essential service to prospective buyers and lenders. They are told what transactions must take place before they can receive clear title or an effective security.

*Id.* (quoting *Bank of California, N.A. v. First Am. Title Ins. Co.*, 826 P.2d 1126, 1129 (Alaska 1992)).

Our Indiana Supreme Court noted insureds, escrow agents, and lenders normally rely on preliminary title reports, and insurance companies not only have full knowledge of this reliance, but also sometimes encourage it. *Id.* (citing *Bank of California*, 826 P.2d at 1129). Title searches are frequently required in situations involving transactions in which the state of the title must be known accurately or the customer foreseeably will suffer harm that is both certain and direct. *Id*. at 749. Title insurers give a preliminary commitment to property purchasers or lenders before the closing of the real estate transaction. *Id*. The buyer or lender then may negotiate with the seller or borrower for the removal or any listed title defects, bargain to pay a lower amount to take subject to those risks, or rescind the

7

transaction.  *Id*.  The buyer or lender who receives a clear preliminary commitment at this stage of the transaction perceives it to be a representation that the seller or borrower has a clear title and may close the transaction in reliance upon it.  *Id*.

The *Integrity* Court held a title company could be found liable for a lender's pecuniary losses under the tort of negligent misrepresentation, *if the title company and the lender did not have a contractual relationship*:  "Integrity has argued at every stage of this litigation that it was not in contractual privity with U.S. Bank.  This is a critical point.  Were there to be a contract between Integrity and U.S. Bank, the parties in all likelihood would be relegated to their contractual remedies."  *Id.* at 745.  The Court explicitly declined to "adopt the proposition that a tort claim for negligent misrepresentation may be brought where the parties are in contractual privity."  *Id*. at 749 n.6.

Chicago Title first argues the Izynskis had no breach of contract action because when they agreed to purchase the property, all versions of the title commitment had been issued to prospective buyer McLane, and not to the Izynskis.  Then it argues the Izynskis have no tort remedy because they *were* in contractual privity with Chicago Title.  Chicago Title cannot have it both ways.  As we find there was no privity when the Izynskis agreed to buy the property, we remand for a determination whether the Izynskis have an action for negligent misrepresentation.

The trial court appears to have determined Chicago Title was not liable in tort on the sole ground the Izynskis and Chicago Title were in contractual privity:  "Pursuant to . . . *Integrity*, plaintiffs in contractual privity with a title company do not have a claim lying in

8

tort for negligent misrepresentation." (App. at 24.) For guidance to the trial court on remand, we address certain matters on which the trial court entered findings and conclusions and that might be determinative of tort liability as well as breach of contract: specifically, whether an agreement in 1972 gave the Izynskis actual notice of an easement that was not created until some seven years later, and the nature of the evidence the Izynskis were required to produce in order to show damages.

### 3. Notice of the Easement

The trial court found that even if the Izynskis had an action for negligent misrepresentation, they could not sustain their burden to prove they were "justifiably ignorant of the existence of the easement." (*Id.* at 26.) The trial court determined, in the context of its breach of contract findings, that the Izynskis had notice of the 1979 easement, which was not shown on the title commitment, because of a 1972 agreement that *was* included in every version of the commitment. That was error.

The 1972 agreement did not serve as notice of the 1979 easement. In 1972, Ashton executed a document captioned "Agreement for Exchange of Land and for Granting Flowage Easement." (*Id*. at 428.) It provided in pertinent part that Shorewood contemplated building a lake, part of which would be constructed on the land Shorewood was conveying to Ashton. A dam was to be built as part of the construction of the lake, and the agreement noted access to the dam for maintenance and repairs would be "difficult and limited," (*id*.), due to the conveyance to Ashton. Accordingly, Ashton agreed he "*will provide* or permit some reasonable access across their remaining land to said dam and appurtenances *if [Shorewood]*

9

*shall require such access* in the future; the exact location and means of access *is to be negotiated between the parties at a future date*. (*Id*.) (emphasis added).

The trial court found the commitment put the Izynskis on notice of the 1979 easement because "[t]he Special Exception for the 1972 agreement put all persons who read the commitment on actual notice of the existence of a general easement for access to the dam." (*Id*. at 25.) It also determined the terms of the 1972 agreement put any parties on constructive notice of the 1979 easement. *Id*. Both conclusions were error.

The 1972 agreement did not create an easement, nor did it provide notice an easement later came into existence – rather, it was nothing more than an agreement to create an easement *if*, "in the future, Shorewood might require one." (*Id*. at 428.) The location and nature of the prospective easement were explicitly deferred for future negotiation. The 1972 agreement therefore could not give the Izynskis notice, actual or constructive, that an easement was in fact established seven years later. More likely, the absence of any reference to the 1979 easement in Chicago Title's report would lead a reasonable buyer to conclude no such easement had ever been established pursuant to the 1972 agreement.

A mere agreement to agree at some future time is not enforceable. *Wolvos v. Meyer*, 668 N.E.2d 671, 674 (Ind. 1996). However, parties may make an enforceable contract that obligates them to execute a subsequent final written agreement:

> It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material

10

term that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

*Id*. at 674-75 (quoting 1 Arthur Linton Corbin and Joseph M. Perillo, *Corbin on Contracts* § 2.8 at 133-34 (rev. ed. 1993)) (footnotes omitted).

We decline Chicago Title's invitation to hold an agreement to create an easement, *if* one might later be required, for some undefined type of access, at some undetermined time in that future, and at some undetermined location can, without more, serve as notice that an easement was, in fact, subsequently established. Chicago Title therefore may not on that ground avoid liability for its own failure to note the easement in every version of its title commitments leading up to the Izynskis' agreement to buy the property.[6]

4.    Damages

As the trial court's findings and conclusions regarding damages were apparently premised on a breach of contract standard, we must remand for a determination whether the Izynskis incurred tort damages for negligent misrepresentation. For guidance on remand, we address one of the trial court's findings regarding damages.

The trial court found "[n]o appraiser or other expert testimony was presented to show the difference between the value of the property before and after the relocation of the easement." (App. at 33.) To the extent the trial court declined to consider the Izynskis

---

[6] Nor may we accept Chicago Title's invitation to hold the words "as subsequently amended" served as notice there must have been subsequent amendments, especially in light of Chicago Title's own report that indicated nothing further had happened since 1972.

11

vidence of damages on the ground it was not "appraiser or other expert testimony," it erred, as no such expert testimony is required. *See State v. Hamer*, 211 Ind. 570, 585, 199 N.E. 589, 595 (1936) (in condemnation proceeding, owner may testify to the value of the land); *Harper v. Goodin*, 409 N.E.2d 1129, 1134 (Ind. Ct. App. 1980) (in breach of contract action, a landowner may testify as to the value of his land).

We accordingly reverse and remand for the trial court to determine whether the Izynskis might have an action for negligent misrepresentation against Chicago Title, and if so whether the elements of that tort are satisfied and whether and to what extent the Izynskis sustained damages.

Reversed and remanded.

NAJAM, J., and RILEY, J., concur.